UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
                                                        :
UNITED STATES OF AMERICA                                :
                                                        :
                                                        :
                                                        :
          -against-                                     :          Case No. 1:21-cr-202-GHW
                                                        :
                                                        :
                                                        :
SEPEHR SARSHAR,                                         :
                                                        :
                              Defendant.                :
--------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT SEPEHR SARSHAR'S
MOTION TO DISMISS THE INDICTMENT, COMPEL THE PRODUCTION
OF A BILL OF PARTICULARS, AND STRIKE SURPLUSAGE**

GIBSON, DUNN & CRUTCHER LLP
AVI WEITZMAN
REED BRODSKY
200 Park Avenue
New York, NY 10166
Telephone:  212.351.4000
Facsimile:  212.351.4035

*Counsel for Defendant Sepehr Sarshar*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 5

I.      BACKGROUND ................................................................................................... 8

        A.      Dr. Sarshar's Personal and Professional Background ................................... 8

        B.      Dr. Sarshar Founds Auspex and Creates Life-Saving Medical
                Breakthroughs ........................................................................................... 8

        C.      The Government Charges Dr. Sarshar With Multiple Disparate
                Alleged Schemes ...................................................................................... 10

                1.      The Alleged Scheme With "Associate-1" .......................................... 12

                2.      The Alleged Scheme with "Associate-2" ........................................... 13

                3.      The Alleged Scheme with "Associate-3" ........................................... 15

                4.      The Alleged Scheme with "Associate-4" ........................................... 15

II.     ARGUMENT ...................................................................................................... 18

        A.      Counts I and II of the Indictment Are Duplicitous and Should
                be Dismissed. .......................................................................................... 18

        B.      The Court Should Order the Government to Produce a Bill of
                Particulars ................................................................................................ 22

        C.      The Court Should Strike Prejudicial and Irrelevant Language
                in the Indictment as Mere Surplusage. ....................................................... 30

III.    CONCLUSION .................................................................................................... 37

# TABLE OF AUTHORITIES

**CASES**

*In re Columbia Pipeline, Inc.*,
    405 F. Supp. 3d 494 (S.D.N.Y. 2019) ........................................................................32

*Grossman v. Novell, Inc.*,
    120 F.3d 1112 (10th Cir. 1997) ...............................................................................24

*Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.*,
    723 F. Supp. 976 (S.D.N.Y. 1989) ...........................................................................23

*Jackvony v. RIHT Fin. Corp.*,
    873 F.2d 411 (1st Cir. 1989) ....................................................................................23

*Kotteakos v. United States*,
    328 U.S. 750 (1946) ..................................................................................................19

*Panfil v. ACC Corp.*,
    768 F. Supp. 54 (W.D.N.Y. 1991), *aff'd*, 952 F.2d 394 (2d Cir. 1991) ............................23, 32

*Taylor v. First Union Corp. of S.C.*,
    857 F.2d 240 (4th Cir. 1988) ..............................................................................23, 32

*United States v. Aracri*,
    968 F.2d 1512, 1518 (2d Cir. 1992) .........................................................................21

*United States v. Bin Laden*,
    92 F. Supp. 2d 225 (S.D.N.Y. 2000) ........................................................................22

*United States v. Blakstad*,
    2020 WL 5992347 (S.D.N.Y. Oct. 9, 2020) .............................................................30

*United States v. Bortnovsky*,
    820 F.2d 572 (2d Cir. 1987) ...............................................................................22, 29

*United States v. Bowline*,
    593 F.2d 944 (10th Cir. 1979) .................................................................................22

*United States v. Carll*,
    105 U.S. 611 (1881) ..................................................................................................22

*United States v. Carpenter*,
    791 F.2d 1024 (2d Cir. 1986) ...................................................................................28

*United States v. Contorinis*,
    No. 1:09-cr-1083-RJS (S.D.N.Y. May 5, 2010) ..................................................26, 28

*United States v. DeFabritus*,
  605 F. Supp. 1538 (S.D.N.Y. 1985)............................................................34, 36

*United States v. DePalma*,
  461 F. Supp. 778 (S.D.N.Y. 1978) ...........................................................35, 36

*United States v. Dioguardi*,
  492 F.2d 70 (2d Cir. 1974)..............................................................................19

*United States v. Droms*,
  566 F.2d 361 (2d Cir. 1977)............................................................................19

*United States v. Freeman*,
  619 F.2d 1112 (5th Cir. 1980) ........................................................................36

*United States v. Gabriel*,
  920 F. Supp. 498 (S.D.N.Y. 1996), *aff'd*, 125 F.3d 89 (2d Cir. 1997)...................20

*United States v. Geibel*,
  369 F.3d 682 (2d Cir. 2004)............................................................................28

*United States v. Hinton*,
  127 F. Supp. 2d 548 (D.N.J. 2000) ............................................................19, 22

*United States v. Kassir*,
  2009 WL 995139 (S.D.N.Y. Apr. 9, 2009).....................................................34

*United States v. Kearney*,
  444 F. Supp. 1290 (S.D.N.Y. 1978)................................................................22

*United States v. Kearney*,
  451 F. Supp. 33 (S.D.N.Y. 1978) ..............................................................18, 19

*United States v. Mahaffy*,
  446 F. Supp. 2d 115 (E.D.N.Y. 2006) .............................................................30

*United States v. Mango*,
  1997 WL 222367 (N.D.N.Y. May 1, 1997)................................................34, 36

*United States v. Margiotta*,
  646 F.2d 729 (2d Cir. 1981)............................................................................20

*United States v. McDermott*,
  245 F.3d 133 (2d Cir. 2001)............................................................................28

*United States v. Mulder*,
  273 F.3d 91 (2d Cir. 2001)........................................................................30, 31

*United States v. Munoz-Franco*,
 986 F. Supp. 70 (D.P.R. 1997)......................................................................19, 20, 22

*United States v. Nacchio*,
 2006 WL 2475282 (D. Colo. Aug. 25, 2006) ............................................................26

*United States v. Pinto-Thomaz*,
 352 F. Supp. 3d 287 (S.D.N.Y. 2018)......................................................................29

*United States v. Pope*,
 189 F. Supp. 12 (S.D.N.Y. 1960) .........................................................................34, 36

*United States v. Rajaratnam*,
 2010 WL 2788168 (S.D.N.Y. July 13, 2010) ...................................................26, 27, 29

*United States v. Sarshar*,
 20-cv-06865 (GBD) (S.D.N.Y. Aug. 25, 2020)...........................................................10

*United States v. Schlei*,
 122 F.3d 944 (11th Cir. 1997) ..............................................................................19, 21

*United States v. Sturdivant*,
 244 F.3d 71 (2d Cir. 2001).................................................................................18, 21, 22

*United States v. Whitman*,
 904 F. Supp. 2d 363 (S.D.N.Y. 2012)......................................................................23

*United States v. Williams*,
 203 F.2d 572 (5th Cir. 1953) ................................................................................30, 31

**OTHER AUTHORITIES**

U.S. Const. amend. VI ...............................................................................................24

Wright & Miller 1 Fed. Prac. & Proc. Crim. § 128 (4th ed. 2021)...............................30

Defendant Sepehr Sarshar ("Dr. Sarshar"), by and through his attorneys, respectfully submits this memorandum of law in support of his pretrial motions to:  (i) dismiss the Indictment because it is duplicitous; (ii) compel the production of a bill of particulars; and (iii) strike prejudicial surplusage from the Indictment under Rule 7(d) of the Federal Rules of Criminal Procedure.  Because of the importance of these issues, Dr. Sarshar respectfully requests oral argument.

## PRELIMINARY STATEMENT

Despite having over six years to investigate the events at issue in this case, the charges in the government's Indictment are incoherent, illogical, and impermissibly vague.  The government attempts to portray this as an open-and-shut case:  that, at various time during the first quarter of 2015, Dr. Sarshar, a board member of Auspex Pharmaceuticals, Inc. ("Auspex" of the "Company"), tipped four friends and family members regarding a potential tender offer from Teva Pharmaceutical Industries Ltd. ("Teva") to purchase Auspex, before the deal was made public on March 30, 2015, and that these friends and family members traded in advance of the announcement.  But that story is pure fiction.  Closer scrutiny of the Indictment makes evident that the government's narrative is filled with holes that no amount of artful pleading can fill in.

For example, the Indictment portrays Dr. Sarshar as a key insider at Auspex, privy to intimate details about the Company's inner workings nearly instantly, when in reality Dr. Sarshar had no active role in the Company for many years and only received occasional updates provided to members of the Board.  Furthermore, the Associates, ███████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████  Yet another hole in the government's case is that several of the Associates, who were supposedly trading on MNPI

but were never charged with any crimes, ████████████████████████

████████████████████████████████

      Given these factual deficiencies, it is perhaps no surprise that the government's Indictment is fatally flawed in at least three key respects. *First*, the government attempts to overcome the weaknesses described above by improperly joining unrelated insider trading schemes into a single count, hoping that the sum of the allegations is greater than their individual parts. In so doing, the government's charges are impermissibly duplicitous under well-established law. Each Count encompasses four distinct and unrelated insider trading schemes involving four separate traders (the "Associates") with no connection between the traders and the events of each disparate scheme. Indeed, no Associate is alleged to have known of any other Associate's alleged insider trading—and there is no common thread that permits charging all four schemes in a single count. By charging what are individually thin allegations together, the government attempts to create the illusion of depth where none exists. The duplicitous charges against Dr. Sarshar leave the defense—and, if not remedied, will leave the jury—grasping at straws as to what must be proved to convict on each count. As such, the Court should dismiss the duplicitous counts or, at a minimum, require the government to identify which of the schemes it intends to prove at trial and provide the jury with a special verdict form that requires unanimity as to each alleged scheme.

      *Second*, the government attempts to mask the shortcomings in its Indictment with charges that entirely lack sufficient particulars. The Indictment provides the defense with insufficient information about when Dr. Sarshar allegedly received MNPI, the nature of that information, and what he is alleged to have conveyed to the Associates. In complex securities cases like this one, where much of the allegedly inside information was publicly available at various points before

the transaction was announced, the government must identify the information it alleges was exchanged and which prompted the trades at issue.  The Court should order the government to remedy the failures of the Indictment by producing an appropriately detailed bill of particulars.

*Third*, the government injects prejudicial surplusage throughout the Indictment that this Court should strike.  By way of example, the Indictment includes allegations suggesting that Dr. Sarshar lied to the Financial Industry Regulatory Authority ("FINRA") about his contacts with certain individuals, even though Dr. Sarshar stated only that he "could not recall" any specific communications with those individuals during a short window of time more than six months earlier.  The Indictment also alleges Dr. Sarshar tipped Associate-3 about a confidentiality agreement signed with an entity that did not ultimately bid to acquire Auspex, despite the absence of any allegation (or proof) that Dr. Sarshar was even aware of the confidentiality agreement at the time.  Similarly, the Indictment includes allegations suggesting Dr. Sarshar provided MNPI to Associate-2 via text message, even though ███████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████    Absent allegations that cohere sufficiently to prove an insider trading scheme, the government should not be permitted to include in the Indictment irrelevant and prejudicial allegations that have nothing to do with any alleged insider trading.  Thus, Dr. Sarshar moves the Court to strike certain allegations in paragraphs 10, 21, 24, 26, 30-32, 42-45, and 51-57 as discussed in greater detail below.

## I.     BACKGROUND

### A.     Dr. Sarshar's Personal and Professional Background

Dr. Sarshar is a successful scientist responsible for novel medical innovations designed to combat some of humanity's most debilitating orphan diseases, like Huntington's disease.[1]  But Dr. Sarshar's immense success was never guaranteed.  At just eleven years old, he and his family were forced to flee Tehran to escape anti-Semitism and persecution in connection with and following the Iranian Revolution.  Over the next decade, the Sarshars adjusted to life in their new homeland and became respected members of the Persian Jewish community in Los Angeles.

Dr. Sarshar adjusted particularly well to his new life.  He excelled as a student, eventually earning a Ph.D. in organic chemistry from Harvard University in 1994.  He then proceeded to work at a series of prominent pharmaceutical companies where he began his research into novel techniques for designing and optimizing life-saving medicines.

### B.     Dr. Sarshar Founds Auspex and Creates Life-Saving Medical Breakthroughs

In 2001, Dr. Sarshar set out on his own and founded Auspex.  The mission of Auspex was to provide a solution to one of the most vexing problems in the pharmaceutical industry— namely, how to reduce the undesirable and at times dangerous side effects of existing drugs without altering their efficacy.  Although the platform technology that Auspex scientists optimized eventually proved broadly applicable, an executive decision was made early on to focus on designing novel treatments for so-called "orphan diseases."  Orphan diseases, such as Huntington's disease, Cystic Fibrosis, and Lou Gehrig's disease, are rare and all-too-often devastating for the afflicted and their families.  Unfortunately, because the orphan-disease

---

[1] Huntington's disease is a fatal genetic disorder that affects a wide-range of brain functions including memory, speech, and movement.  It is likened to suffering from ALS, Parkinson's, and Alzheimer's at the same time.

market is relatively small, research into treatments for such diseases is severely underfunded by pharmaceutical companies.  Fully aware of the financial risks when he founded Auspex, Dr. Sarshar nevertheless took on the challenge and dedicated himself and his Company to researching how to lessen the burdens for millions of people suffering from orphan diseases.

After years of tireless research, Dr. Sarshar and his team at Auspex made an important breakthrough by applying the process of "deuteration" to the modification of existing drugs. Deuteration is a chemical transformation by which one or more hydrogen atoms of a given molecule are replaced by the non-radioactive isotope deuterium.  By deuterating a drug, Auspex was able to slow down its rate of oxidative metabolism and, as a consequence, reduce its dosage and frequency of dosing without altering its efficacy.  This, in turn, significantly reduced the side effects that were associated with the non-deuterated parent drug.

Although he founded Auspex, Dr. Sarshar gave up his management role at the Company in 2009, ceding control to a professional executive team and limiting his role to a seat on the Board of Directors of Auspex.  On February 5, 2014, Auspex had a successful initial public offering ("IPO") with a listing on the NASDAQ Global Market.  One of the reasons for Auspex's successful IPO was the unparalleled progress of the Company's first clinical candidate, Austedo/SD-809.  Austedo is a deuterated version of Xenazine, a drug that was approved in the U.S. in 2008 for the treatment of Huntington's disease.  Although Xenazine is an efficacious drug that helps reduce the involuntary movements associated with Huntington's disease, the frequency of its dosing causes serious side effects.

In December 2014, Auspex received positive efficacy and safety results in a Phase 3 trial of Austedo, showing a near-total reduction in side effects among Huntington's patients. Austedo's successful trial results were covered heavily in the media and were seen as a likely

sign that Auspex would gain FDA approval for its drug treatments.[2]  And Austedo's promising results were just the tip of the proverbial iceberg.  Auspex had a vast intellectual property estate of over 60 deuterated analogs of existing drugs that could have been advanced rapidly into late clinical stage.

Once the Austedo results were made public in late 2014, Auspex was widely and publicly reported to be an acquisition target.  Declaration of Avi Weitzman ("Weitzman Decl.") Ex. 1. By February 2015, a number of pharmaceutical companies, including Teva, an Israeli company, initiated strategic discussions with Auspex.  The discussions between these companies and Auspex were conducted between their respective executive teams.  Long outside of the management of Auspex, Dr. Sarshar had no involvement in those discussions—indeed, he never had any direct contact with any representatives of Teva or any of the other potentially acquiring companies—and little insight into the specifics of the transaction unless and until management updated the Board.  After much reporting about the potential acquisition of Auspex in the press, the acquisition by Teva was officially announced on March 30, 2015.

**C.    The Government Charges Dr. Sarshar With Multiple Disparate Alleged Schemes**

On March 24, 2021, nearly *six years to the day* after the Teva acquisition of Auspex was announced, a two-count Indictment was returned against Dr. Sarshar.  ECF No. 15.[3]  Both Count I (securities fraud) and Count II (tender offer fraud) are based on the same allegations:  that Dr.

---

[2]  In 2017, the FDA officially approved Austedo for use to treat both Huntington's disease and Tardive Dyskinesia, a rare but powerful side effect of certain drugs used to treat schizophrenia and other neurological disorders that causes involuntary and painful muscle spasms.

[3]  A criminal complaint was filed under seal in this matter on August 21, 2020.  ECF No.  1. On August 25, 2020, the SEC and the government publicly filed Complaints against Dr. Sarshar for alleged insider trading.  *See* ECF Nos. 3, 4; SEC Complaint, *United States v. Sarshar*, 20-cv-06865 (GBD) (S.D.N.Y. Aug. 25, 2020), ECF No. 1.

Sarshar provided four of his friends and family (referred to in the Indictment as the "Associates"), with material, non-public information ("MNPI") concerning a potential acquisition of Auspex, and that the Associates then traded on this information.  The Indictment further alleges that the Associates tipped four remote tippees who then traded on MNPI. Notably, the government does not allege that Dr. Sarshar himself traded in advance of the announcement or benefitted in any way—not even earning one dollar—from any trading by the Associates or the remote tippees, none of whom have been charged with any crimes.

Despite years of investigation, the government has no direct evidence of Dr. Sarshar's involvement in insider trading.  To the contrary, ███████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ █████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ██████████████████████████████ Similarly, while the Government alleges that the four Associates subsequently tipped four remote tippees, ████████████████████████████████ ████████████████████████████████████ ████████████████████████████████ ████████████████████ render this perhaps one of the most illogical and unfounded alleged insider trading schemes ever charged.

The only witness who claims to have received and traded on Auspex MNPI is the government's cooperating witness ("CW"), who ████████████████████ ████████████████████ We further understand that the ████████████████████ ████████ But the CW's testimony is subject to substantial attack, including the fact that ████████████████████ ████████████████████ ████████████████████ ████████████████

But these are just some of the holes in the government's case. As explained below, the government's allegations in the Indictment are threadbare, and the government hopes to overcome its inadequate allegations by improperly charging all of the disparate schemes together. But the holes in the Indictment only become more glaring when grouped together, as they show the complete lack of connection between the allegations pertaining to each Associate. The four alleged insider trading schemes at the heart of the government's Indictment are described below.

1.    **The Alleged Scheme With "Associate-1"**

The first alleged scheme involves Associate-1, the CW, and a member of Associate-1's family. The Indictment identifies a series of calls and text messages between Dr. Sarshar and Associate-1 in February and March of 2015, Indict. ¶¶ 17, 20, 21, 24, 26, 27, as well as separate communications between Associate-1 and the CW, *Id*. ¶¶ 22, 27, and Associate-1 and his family member. Dr. Sarshar is not alleged to have provided MNPI to the CW or Associate-1's family member, and is not alleged to have known of the communications Associate-1 had with either the CW or the family member.

The government appears to allege that on March 11, Dr. Sarshar attended an Auspex Audit Committee Meeting, after which he called Associate-1 and provided him with MNPI— "confidential information regarding a possible tender offer."  Indictment ¶¶ 19-21.  The government alleges that on that same day (March 11), Associate-1 then conveyed to the CW the allegedly confidential information purportedly received from Dr. Sarshar.  *Id.* ¶ 22.  The government does not identify the specific confidential information that was allegedly provided, and the ████████████████████████████████████████████ ████████████████████████████████.  In addition to there being no evidence Dr. Sarshar learned or conveyed MNPI on March 11, ████████████████████████ ████████████████████████████████████████████ and, as we intend to show at trial, ████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████

### 2.    The Alleged Scheme with "Associate-2"

The second scheme alleged in the Indictment involves Associate-2 and her co-worker (the "Co-Worker").  Dr. Sarshar is alleged to have exchanged calls and text messages with Associate-2, who was his longtime girlfriend at the time, between February 24 – March 27,

---

[4] ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████

2015.  *Id*. ¶¶ 30, 32, 34, 35, 37, 39, and 40.  The government also notes several alleged developments in the Auspex-Teva negotiations during this same time period.  *Id*. ¶¶ 30, 37-39.

However, the Indictment does not identify whether, when, or how Dr. Sarshar learned about these developments, and what, if any, alleged MNPI he supposedly passed to Associate-2. For example, the government alleges that on February 24, 2015, Teva submitted a non-binding proposal to acquire Auspex and that Dr. Sarshar exchanged texts with Associate-2 on the same day.  *Id*. ¶ 30.  Notably, the government does not allege that Dr. Sarshar learned of Teva's proposal on that date, much less that he learned about it before texting Associate-2.  In early 2015, Dr. Sarshar was not part of Auspex's management team, had no role in the negotiations with Teva, and was only privy to the limited information provided to the Auspex Board.

The Indictment also alleges that Associate-2's Co-Worker traded in Auspex.  *Id*. ¶ 33. Between February 24 – March 3, 2015, the Co-Worker worked with her broker to invest in Auspex.  *Id*. ¶ 33-36.  However, the government does not allege that the Co-Worker communicated with Dr. Sarshar about Auspex, and in fact, ███████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████The first, and only, communication allegedly linking the Co-Worker with Associate-2 is a two-minute call on March 11—over two weeks *after* the Co-Worker began the financial transactions that provided her with the assets to invest in

Auspex.  *Id.* ¶ 37.  In addition, as with the communications between Dr. Sarshar and Associate-2, there is no allegation in the Indictment regarding what, if any, MNPI Associate-2 allegedly passed to her Co-Worker during the March 11 call.

**3.      The Alleged Scheme with "Associate-3"**

The third scheme outlined in the Indictment involves Associate-3.  The entirety of the government's allegations regarding Associate-3 revolve around a single phone call between Dr. Sarshar and Associate-3 on the morning of March 6, 2015.  Indictment ¶ 42.  Though the Indictment does not state what Associate-3 and Dr. Sarshar discussed on this call, it implies that Dr. Sarshar provided information pertaining to a confidentiality agreement between Auspex and a potential acquirer other than Teva that was signed on March 6, 2015.  *Id.*  However, the Indictment notably does not allege that Dr. Sarshar had knowledge of this confidentiality agreement before his call with Associate-3, or even that the confidentiality agreement was signed before the morning call with Associate-3.

**4.      The Alleged Scheme with "Associate-4"**

The fourth and final scheme alleged by the government involves alleged tips to Associate-4, ████████████████████████████████ (referred to in the Indictment as the "Domestic Partner").  The government alleges that Dr. Sarshar and Associate-4 spoke by phone four times in early 2015.  Indictment ¶¶ 45, 46, 48, 49.  The Indictment does not detail the content of these phone calls. ████████████████████████

████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████████████████

██████████

According to the Indictment, the Associate-4 scheme was initiated on February 10, 2015 when Dr. Sarshar and Associate-4 spoke on the phone for approximately 15 minutes. *Id.* ¶ 45. As with every other call referenced in the Indictment, the government does not describe the content of this call or what, if any, MNPI was exchanged. The government seeks to draw a connection between the call and a February 9-10, 2015 meeting in Israel between representatives of Auspex and Teva. *Id.* ¶ 44. Indisputably, Dr. Sarshar did not attend the February meetings, and there is no allegation that he was aware of what occurred at the Israel meeting before his call with Associate-4.

The second supposed exchange of MNPI in the fourth scheme is alleged to have occurred on February 17, 2015 at 8:31 a.m.,[5] when Dr. Sarshar called Associate-4 for approximately one minute, and later that day when Associate-4 traded calls of an unidentified length of time with his Domestic Partner. *Id.* ¶¶ 46-47. The government also notes that on February 16-17, 2015, Dr. Sarshar attended an Auspex board meeting at which the Auspex CEO is alleged to have discussed "inbound interest in acquiring Auspex, including from Teva." *Id.* ¶¶ 16, 46. While the government is correct that the Board, including Dr. Sarshar, received information about "preliminary discussions" regarding a strategic transaction at this meeting, ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[5] Unless otherwise noted, all times referenced in this filing are in Pacific Time ("PT").

█████ Given the sequence of events, any MNPI exchanged on the morning of the 17th could only have been provided to Dr. Sarshar on the first day of the board meeting. The Indictment does not state, and the board minutes offer no insight, as to what MNPI, if any, Dr. Sarshar is alleged to have received on February 16, and then conveyed to Associate-4 in the less than one minute long phone call. Nor does it state what, if any, of this information was conveyed by Associate-4 to the Domestic Partner.

The government alleges that on March 5, 2015, the Domestic Partner purchased additional shares of Auspex. Indict. ¶ 48. This purchase was allegedly based on March 4, 2015 calls between Dr. Sarshar and Associate-4, and Associate-4 and his Domestic Partner. *Id*. The Indictment does not identify any new information about the potential transaction that Dr. Sarshar learned on or about this date, nor does it identify what, if any, alleged MNPI was provided on either of the calls.

The final allegation in the Associate-4 "scheme" involves trading by Associate-4 and the Domestic Partner on March 25, 2015, a day on which Dr. Sarshar allegedly spoke to the Auspex CEO. *Id*. ¶ 49. The government attempts to connect these two events—Dr. Sarshar supposedly learning MNPI from the Auspex CEO and the March 25 trading—by lumping them together in a single paragraph of the Indictment. However, the government does not, and cannot, identify any communication between Dr. Sarshar and Associate-4 between the time Dr. Sarshar allegedly spoke with the Auspex CEO and the time Associate-4 and the Domestic Partner traded. Notably, Associate-4 and Dr. Sarshar lived on opposite coasts of the country at the time.[6] Indeed,

---

[6] In addition, as the government knows, there is a well-documented, innocent explanation for Associate-4's March 25, 2015 trading in Auspex. ████████████████████
████████████████████████████████████████████████████████████
████████████████████

according to the Indictment, Dr. Sarshar had no contact with Associate-4 since March 4, 2015, *three weeks* before the allegedly wrongful trading activity.

Finally, Associate-4 is alleged to have *sold* a significant portion of the Auspex shares he purchased in February and March of 2015 before the public announcement of the Teva deal and subsequent stock price increase—a baffling decision for someone who is supposed to have been trading on MNPI.  *Id*. ¶ 50.

## II.   ARGUMENT

### A.   Counts I and II of the Indictment Are Duplicitous and Should be Dismissed.

Both Counts of the Indictment are impermissibly duplicitous in violation of Fed. R. Crim. P. 8(a) because they charge Dr. Sarshar with at least four separate and distinct schemes: each a scheme between Dr. Sarshar and the respective Associate.  This duplicity risks a non-unanimous verdict of guilt, improper sentencing, and potential double jeopardy concerns.  As such, the Court should dismiss the Indictment or require the government to elect one single scheme to pursue at trial.

"An indictment is impermissibly duplicitous where: 1) it combines two or more distinct crimes into one count in contravention of Fed. R. Crim. P. 8(a)'s requirement that there be a separate count for each offense, and 2) the defendant is prejudiced thereby."  *United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001) (internal citation omitted).  "The prohibition against duplicity has constitutional underpinnings in the Sixth Amendment's guarantee that an accused be adequately informed of the nature and cause of the accusation and the Fifth Amendment's interdiction against double jeopardy."  *United States v. Kearney*, 451 F. Supp. 33, 35 (S.D.N.Y. 1978) (internal citation omitted).

There is no single test to determine if an indictment is duplicitous.  To judge duplicity in a fraud case, the court should ascertain whether the alleged acts comprise one unitary scheme to

defraud or multiple separate schemes. *See, e.g.*, *United States v. Hinton*, 127 F. Supp. 2d 548, 554-56 (D.N.J. 2000) (finding the indictment duplicitous where one count purported to charge a single offense, but actually encompassed distinct frauds against multiple financial institutions); *United States v. Munoz-Franco*, 986 F. Supp. 70, 71-72 (D.P.R. 1997) (dismissing counts where two distinct crimes involving different factual scenarios were improperly charged together). In the context of securities fraud allegations, "a count containing two securities offenses is duplicitous." *United States v. Schlei*, 122 F.3d 944, 997 (11th Cir. 1997); *see also United States v. Dioguardi*, 492 F.2d 70, 83 (2d Cir. 1974) ("each transaction in a securities fraud case constitutes a separate offense"). In deciding whether a specific count improperly groups two distinct crimes, courts consider whether identical evidence will support each of the charged offenses—if different facts must be proven as to each alleged scheme, the count contains multiple offenses and is potentially duplicitous. *See Kearney*, 451 F. Supp. at 37; *United States v. Droms*, 566 F.2d 361, 363 (2d Cir. 1977) (providing charges in a single count required "entirely different proof").[7]

Both Counts One and Two are plainly duplicitous, and each count squarely implicates the concerns about prejudice underlying the rule against duplicitous counts. The Indictment fails to allege any connection between the Associates or remote tippees of the four respective schemes. No Associate is alleged to have discussed the information allegedly received from Dr. Sarshar or

---

[7]   In conspiracy cases, courts have long relied on a "hub-and-spoke" analysis to determine whether multiple conspiracies exist or whether the government improperly charges as a single conspiracy multiple separate conspiracies involving one "hub" and multiple spokes. *See Kotteakos v. United States*, 328 U.S. 750, 755 (1946) (finding multiple conspiracies where there was a pattern of "separate spokes meeting at a common center…without the rim of the wheel to enclose the spokes"). Though no conspiracy is charged here, the logic of *Kotteakos* and its progeny are helpful in identifying the prejudicial nature of the allegations against Dr. Sarshar, who is merely the common center of four distinct schemes, without a rim to connect them.

his/her decision to trade on that information with any other Associate. For that matter, the Indictment does not allege that any Associate was even in contact with the other Associates during the relevant time period. Indeed, the Indictment alleges that each Associate was tipped individually, at separate times, across a time period spanning two months. Given the fluctuating status of the deal negotiations, and the lack of particulars from the government, it is unclear whether the government alleges that the Associates received or traded on the same pieces of inside information. Thus, each of the alleged schemes is based on a different set of pertinent allegations related to MNPI, tipping dates, tipping methods, and trading.

The duplicity of the charges against Dr. Sarshar is further supported by the structure of the Indictment. Courts often find support for a finding of duplicity where an indictment is "neatly divided" into distinct sets of acts and/or actors. *Munoz-Franco*, 986 F. Supp. at 71. In *Munoz-Franco*, the court noted that "despite the government's representations" of a single charged conspiracy, the structure of the indictment, which included subtitles dividing the count into "distinct sets" of actors and actions, indicated that multiple crimes were actually being charged. *See also United States v. Gabriel*, 920 F. Supp. 498, 503-04 (S.D.N.Y. 1996), *aff'd*, 125 F.3d 89 (2d Cir. 1997) (finding duplicity assessment "reinforced" by the structure of the indictment, which lists and divides acts into two separate schemes). The allegations of Count One (which are incorporated wholesale into Count Two) are subdivided by scheme into four distinct sets of allegations. This structure establishes the dividing lines between each of the separately charged schemes, further demonstrating the duplicitousness of the Indictment.

Duplicitous pleadings must be addressed by the court when they invoke the "policy considerations that underlie that doctrine," and therefore risk "unfairness to the defendant." *United States v. Margiotta*, 646 F.2d 729, 733 (2d Cir. 1981) (internal quotations omitted). The

most common prejudice threatened by duplicity is the risk that the jury could convict on a less-than-unanimous basis, by having some jurors voting to convict on one offense while other jurors voting for conviction on another offense charged in the same count. *Id*.  Other ways in which a defendant may be prejudiced by a duplicitous count include: (i) inadequate notice of the nature of the crime to be proved at trial; (ii) inadequate basis for appropriate sentencing in the event of a conviction; and (iii) protecting against double jeopardy in a subsequent prosecution. *Id*. *United States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir. 1992).

The government's decision to group all of the allegations against the four Associates in a single count unquestionably prejudices Dr. Sarshar.  As currently charged, Dr. Sarshar could be found guilty by a jury, and have no notice of which of the multiple schemes, and multiple alleged tips, his conviction is based on.  Because the allegations are all included in a single count, a jury finding of guilty could also be non-unanimous; based not on any one of the schemes, but on different schemes, depending on the views of individual jurors.  *See, e.g., Schlei*, 122 F.3d at 980 (vacating conviction where conviction based on nonunanimous verdict on a duplicitous charge when the court lacked venue over one of the charges).  In addition, insider-trading sentences vary based on factors such as the number of transactions, the dollar value of the transactions, the number of participants in the scheme, and the number of instances in which MNPI was obtained.  U.S. Sent'g Guideline Manual, § 2B1.4 (U.S. Sent'g Comm'n 2018).  Dr. Sarshar "would be harmed by a sentence based on the assumption that the jury convicted him for participation in" the multiple schemes charged together in a duplicitous count.  *Sturdivant*, 244 F.3d at 78 .

Given the duplicity in the Indictment, the Court should either dismiss the Indictment or require the government to elect which of the alleged schemes it will seek to prove at trial.  "[T]he appropriate remedy for a duplicitous count is to require the government to elect one of the

multiple offenses embraced therein on which to proceed." *United States v. Kearney*,

444 F. Supp. 1290, 1295 (S.D.N.Y. 1978); *see also Sturdivant*, 244 F.3d at 78 (defendant harmed

by duplicitous indictment despite unanimity instruction because general verdict created

uncertainty as to the transaction for which he was convicted); *cf. Hinton*, 127 F. Supp. 2d at 556

(holding that "a bill of particulars cannot cure a defective indictment" and therefore only election

or dismissal are proper remedies to a duplicitous indictment).  Where an election of charges is

insufficient, or where the government fails in the Indictment or a bill or particulars to "fully,

directly and expressly, without uncertainty or ambiguity, set forth all the elements necessary to

constitute the offense intended to be punished," dismissal is the proper remedy.  *Kearney*, 444 F.

Supp. at 1296 (*citing United States v. Carll*, 105 U.S. 611, 612 (1881)); *see also Munoz-Franco*,

986 F. Supp. at 72 (dismissing counts as duplicitous); *United States v. Bowline*, 593 F.2d 944,

947 (10th Cir. 1979) (affirming district court decision to dismiss duplicitous charge, rather than

allow government to elect which offense to proceed on).

### B.        The Court Should Order the Government to Produce a Bill of Particulars

Federal Rule of Criminal Procedure 7(f) "permits a defendant to seek a bill of particulars

in order to identify with sufficient particularity the nature of the charge pending against him,

thereby enabling [the] defendant to prepare for trial, to prevent surprise, and to interpose a plea

of double jeopardy should he be prosecuted a second time for the same offense."  *United States*

*v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987).  Although the Rule originally allowed a court to

order a bill of particulars only upon a showing of cause, this requirement was dropped in an

effort "to encourage a more liberal attitude by the courts toward bills of particulars."  Fed. R.

Crim. P. 7 advisory committee's note to 1966 amendment; *see also United States v. Bin Laden*,

92 F. Supp. 2d 225, 232 (S.D.N.Y. 2000).  In light of this amendment, a motion for a bill of

particulars should be granted so long as the bill of particulars would provide details of the charge

that are "necessary to the preparation of [the] defense, and to avoid prejudicial surprise at trial." *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990), *overruled on other grounds by United States v. Marcus*, 628 F.3d 36, 41 (2d Cir. 2010).

This Court should order the Government to produce a bill of particulars identifying (1) the MNPI that Dr. Sarshar allegedly communicated to each of the four Associates identified in the Indictment, (2) when and how Dr. Sarshar allegedly became aware of this MNPI, (3) when and how Dr. Sarshar allegedly communicated the MNPI to a tippee; and (4) for which trades allegedly based on MNPI the Government seeks to hold Dr. Sarshar liable.[8]  These are crucial elements of the Government's case because Dr. Sarshar may be found guilty of insider trading only if he communicated *material* information to the alleged Associates that was *nonpublic* at the time he did so.  In cases involving mergers and acquisitions, nonpublic information is only "material" if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *United States v. Whitman*, 904 F. Supp. 2d 363, 368 (S.D.N.Y. 2012).  Merger discussions that are only "preliminary, contingent, and speculative" cannot, as a matter of law, constitute "material" nonpublic information.  *Taylor v. First Union Corp. of S.C.*, 857 F.2d 240, 244 (4th Cir. 1988); *see also Panfil v. ACC Corp.*, 768 F. Supp. 54, 58 (W.D.N.Y. 1991), *aff'd*, 952 F.2d 394 (2d Cir. 1991).  Similarly, merger discussions are not "material" nonpublic information where the information at issue is already widely known or obvious, *Jackvony v. RIHT Fin. Corp.*, 873 F.2d 411, 415 (1st Cir. 1989); *Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.*, 723 F. Supp. 976, 986 (S.D.N.Y. 1989), or reflects only "vague

---

[8]  The government refused outright to respond to Dr. Sarshar's previous request for particulars. *See* Weitzman Decl. Ex. 13.

statements of corporate optimism," *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997).

Because the Indictment contains gaping holes as to what MNPI Dr. Sarshar allegedly communicated or how he became aware of this MNPI, Dr. Sarshar is left to prepare a defense based on guesswork and speculation as to the substance of the Government's accusations. *Cf.* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation.")  To take just a few examples:

| **Allegation** | **Deficiency** |
|---|---|
| **Associate-4's February 17 Trade:**<br><br>"On or about February 17, 2015, the second day of the February 2015 Board Meeting described above, at approximately 8:31 a.m., SEPEHR SARSHAR, a/k/a 'Sep,' the defendant, called Associate-4.  Associate-4, who was then in New York, New York, immediately returned the call and the two were connected for approximately one minute.  Less than ten minutes later, at approximately 8:40 a.m., Associate-4 placed a limit order to buy 4,300 shares of Auspex at approximately $68.60 per share."  Indict. ¶ 46. | The Indictment does not specify whether the Government alleges that Dr. Sarshar communicated information from the February 2015 Board Meeting to Associate-4 and, if so, the content of that information.  This is important because, according to the Indictment itself, the February 2015 Board Meeting included discussion of nonmaterial and/or public information.  *See* Indict. ¶ 16.  Furthermore, given the Indictment's allegations that Associate-1, Associate-4, and Associate-4's Domestic Partner traded on MNPI after the February 17, 2015 Board meeting but *before* Teva submitted a non-binding proposal on February 24, 2015, *id.* ¶¶ 17, 46-47, the Government should specify *what* MNPI Dr. Sarshar allegedly obtained and communicated during this time period. |
| **Associate-2's February 27 Trade:**<br><br>"On or about Friday, February 27, 2015, Associate-2 completed the process she began on February 24, 2015, liquidating various mutual fund holdings in her principal 401(k) Account, transferring approximately $52,450.98 from that account to an SDBA with the Broker, and using those funds to purchase 750 shares of Auspex at a price of approximately $67 per share.  Approximately five minutes after Associate-2 purchased | The Indictment alleges that Associate-2 completed the process she began on February 24, 2015, after exchanging text messages with Dr. Sarshar.  The Indictment alleges that on February 24, 2015, Teva submitted a non-binding proposal to Auspex.  Indict. ¶ 30.  The Indictment does not allege when, whether, or how Dr. Sarshar learned about this proposal, and, if he did, when or what he communicated to Associate-2.  Furthermore, the Indictment does not allege that Associate- |

| | |
|---|---|
| these shares, Associate-2 sent a text message to SEPEHR SARSHAR, a/k/a Sep, the defendant." Indict. ¶ 35. | 2's trading was based on MNPI regarding Teva's proposal or any other information. |
| **Associate-3's March 6 Trade:**<br><br>"On or about Friday, March 6, 2015, Auspex signed a confidentiality agreement with a potential suitor different from Teva. That same day, at approximately 11:50 a.m., SEPEHR SARSHAR, a/k/a 'Sep,' the defendant, called Associate-3 for a call lasting approximately two minutes. Shortly thereafter, between approximately 11:55 a.m. and 1:10 p.m., SARSHAR spoke by phone with Associate-3 for a total of approximately 75 minutes." Indict. ¶ 42. | The Indictment does not specify whether the government alleges that Dr. Sarshar knew of the confidentiality agreement when he communicated with Associate-3 on March 6, 2015. The Indictment also does not provide the substance of information Dr. Sarshar allegedly provided to Associate-3. In fact, the Indictment does not even allege *when* on March 6, 2015, Auspex signed the confidentiality agreement—important information given that Dr. Sarshar and Associate-3 communicated in the morning. |
| **Associate-4's March 25 Trade:**<br><br>"On or about March 25, 2015, immediately following the phone call between SEPEHR SARSHAR, a/k/a 'Sep,' the defendant, and the Auspex CEO, as described above, Associate-4 placed a limit order to buy 4,900 shares of Auspex at approximately $65.49 per share. On or about the same day, and approximately half an hour after Associate-4 purchased these shares, the Domestic Partner purchased an additional 76 shares of Auspex." Indict. ¶ 49. | The Indictment does not specify whether Associate-4's March 25, 2015 trades were allegedly based on MNPI received from Dr. Sarshar, and if so, the substance of any alleged tip from Dr. Sarshar to Associate-4 .<br><br>Although the Indictment alleges that Associate-4 traded shortly after Dr. Sarshar's call with the Auspex CEO, it does not allege that Dr. Sarshar communicated with Associate-4 following that call. In fact, the last communication between Dr. Sarshar and Associate-4 alleged in the Indictment took place *three weeks* earlier, on March 4, 2015. Indict. ¶ 48. |
| **Associate-2's Co-Worker's March 25 Trade:**<br><br>"The following day, on or about March 25, 2015, at approximately 9:16 a.m., the Auspex CEO called SEPEHR SARSHAR, a/k/a "Sep," the defendant, and the two spoke for approximately 39 minutes. Shortly after this call ended, at approximately 10:19 a.m., SARSHAR called Associate-2. Six minutes later, at approximately 10:25 a.m., Associate-2 purchased an additional 75 shares of Auspex in another brokerage account owned by Associate-2 at the then market price of | The Indictment does not specify whether the Government alleges that the Co-Worker's March 25, 2015 trade, or any of her other trades, were based on MNPI from Dr. Sarshar and, if so, the content of that MNPI and when it was communicated to the Co-Worker. The Indictment does not allege Dr. Sarshar ever spoke with the Co-Worker. The Indictment does allege one March 11, 2015 communication between the Co-Worker and Associate-2, but that communication was two weeks prior to the Co-Worker's trading. Indict. ¶ 37. Furthermore, the Indictment shows that the Co-Worker began the process |

| | |
|---|---|
| $65.41 per share. At approximately the same time, Associate-2 sent a text message to SARSHAR stating "Just bought 75 shares." The same day the Co-Worker also purchased an additional 225 shares of Auspex at the then market price of $65.91 per share." Indict ¶ 39. | of reorganizing her finances to invest in Auspex as early as February 24, 2015—over a month before the Co-Worker's trading. *Id.* ¶ 33. |
| **Associate-1's March 26 Trade**: <br><br> "On or about March 26, 2015 and on or about March 27, 2015, the last two business days before the March 30 Press Release, Associate-1 purchased a total of at least approximately 19,500 shares of Auspex stock.  On or about March 31, 2015, the day following the March 30 Announcement, Associate-1 sold approximately 7,000 shares of Auspex stock at a price of approximately $100 per share[.]" Indict. ¶ 29. | The Indictment does not specify whether the Government alleges that Associate-1's March 26, 2015 and March 27, 2015 trades were based on MNPI from Dr. Sarshar and, if so, the content of that MNPI and when it was communicated to Associate-1.  On the contrary, the last communication between Dr. Sarshar and Associate-1 alleged in the Indictment occurred on March 19, 2015, *see* Indict. ¶ 27, a full week before Teva representatives told Auspex's CEO that they would proceed with the tender offer, *see id.* ¶ 28. |

Courts routinely order bills of particulars in insider trading cases based on similarly vague and incomplete allegations regarding the nature and source of purported MNPI.  *See, e.g.*, *United States v. Rajaratnam*, 2010 WL 2788168, at *10 (S.D.N.Y. July 13, 2010); *United States v. Contorinis*, No. 1:09-cr-1083-RJS, Dkt. 49 at 1 (S.D.N.Y. May 5, 2010) ("[T]he government shall submit a bill of particulars with respect to the material, non-public information allegedly disclosed in connection with the Albertson's transactions."); *United States v. Nacchio*, 2006 WL 2475282, at *6 (D. Colo. Aug. 25, 2006) ("[T]he court ordered the Government, with respect to paragraph six, to identify 'all material nonpublic information that the Government claims [Defendant] was aware of between December 4, 2020 and September 10, 2021.'  Specifically, the court noted that this information is 'necessary to defend against these [forty-two] charges, because the indictment right now simply charges that he was aware of this information without saying when he became aware of it or without tying it to any particular count in the

indictment.'") (internal citation omitted).  This is for good reason.  In the words of Judge Richard J. Holwell:  "[T]his is an insider trading conspiracy case, which means the government must prove that the defendants conspired to acquire material nonpublic information.  The merits of such a charge depend heavily on the facts and context.  A defendant might argue that the information he sought to obtain was not material, or that it was already public at the time he tried to get it.  *But he can only do that if he knows what the information* is *and when it was conveyed*."  *Rajaratnam*, 2010 WL 2788168, at *2 (emphasis added).

This information is especially important here because it was widely known that Auspex was a potential acquisition target during the time that Dr. Sarshar is alleged to have communicated MNPI to the purported Associates, raising questions as to whether the information that Dr. Sarshar allegedly tipped was nonpublic and whether the Associates traded on rumors, not any communication from Dr. Sarshar.  For example, following positive Phase III results for its groundbreaking drug Austedo in late 2014, Auspex received first-day billing at JP Morgan's Healthcare Conference in January 2015, the premier conference for deal-making in the healthcare industry—a strong signal that JP Morgan was facilitating a deal involving the Company.  *See* Weitzman Decl. Ex. 14 (noting that the J.P. Morgan Conference is "one of the biggest biotech dealmaking events, often setting the tone for funding rounds, partnerships and mergers and acquisitions for the first part of the year").  Shortly thereafter, a trade publication reported that "Auspex Pharmaceuticals' recent positive Phase III data for its lead Huntington's disease (HD) drug has positioned it as a potential takeout candidate, according to industry bankers and analysts."  *Id.* Ex. 1 (BioPharm Insight Feb. 13, 2015 Report).  According to that report, "[g]iven the recent Phase III data for SD-809 in chorea associated with HD, and the pending Phase II/III results in Tardive Dyskinesia (TD), there is a high likelihood of a bidder

acquiring the company in the near term." *Id.* And Teva itself was identified as a potential

acquirer: "Potential bidders that can make use of Auspex's deuterium platform to increase

bioavailability of their own generic portfolio, such as Israeli Teva, could be interested." *Id.* As

Judge Richard J. Sullivan acknowledged in *Contorinis*, where there is widespread public

information about an impending transaction, the government bears a higher burden in alleging

MNPI. *See Contorinis*, Dkt. 50 at 49:9-13 ("In Albertson's we know that there was a lot of

public information about this subject. For certain deals there is not much information. So the

mere assertion that this involved a merger for which there was no public disclosure would not be

enough, right?").

The Government also should give Dr. Sarshar notice as to which trades it seeks to hold

him criminally liable. The Indictment alleges Dr. Sarshar provided unidentified MNPI to four

Associates who tipped four remote tippees, resulting in eight different individuals who allegedly

traded on MNPI. But the Indictment does not specify which of these trades form the basis of Dr.

Sarshar's liability, or whether the Government seeks to hold Dr. Sarshar liable for *any* of the

remote tippees' trades. This ambiguity has profound implications for Dr. Sarshar's defense. For

example, if the Government does not intend to prove that Dr. Sarshar conspired with the remote

tippees to trade on MNPI—which we believe the government cannot prove—Dr. Sarshar cannot

be held liable for the remote tippees' trades, which only raises the question of why allegations

regarding the remote tippees' trading is even included in the Indictment. *See, e.g.*, *United States*

*v. Geibel*, 369 F.3d 682 (2d Cir. 2004); *United States v. McDermott*, 245 F.3d 133 (2d Cir.

2001); *United States v. Carpenter*, 791 F.2d 1024 (2d Cir. 1986) (holding that tipper "may not be

held liable as to [the tippee's] trades with or on behalf of [the remote tippee], as to whom [the

tipper] had no agreement or knowledge"). As written, the Indictment provides Dr. Sarshar no

way of knowing whether he is being charged with participating in a common scheme with

respect to *all* of the tippees' trades, or whether the remote tippees' alleged trades are included in

the Indictment for some other purpose.  The Government should produce a bill of particulars to

specify the trades for which it intends to hold Dr. Sarshar liable.

To be sure, the need for a bill of particulars may be diminished where discovery supplies

the information that is missing from an indictment.  *See United States v. Pinto-Thomaz*, 352

F. Supp. 3d 287, 302–03 (S.D.N.Y. 2018) ("In considering whether a bill of particulars is

required, the Court considers not only the information provided in the indictment, but also

discovery materials and other information provided to the defendant.")  But while the

Government has produced substantial discovery in this case—over 763,328 documents to

date[9]—none fills in the holes in the Indictment so as to allow Dr. Sarshar to adequately prepare

for trial.  None of the documents produced by the Government identifies the MNPI Dr. Sarshar is

alleged to have tipped the Associates, or whether and when Dr. Sarshar became aware of the

MNPI at issue.  And in any event, a large quantity of discovery is not sufficient when it does not

serve to apprise the defendant of the accusations leveled by the Government.  *See Bortnovsky*,

820 F.2d at 575 ("The Government did not fulfill its obligation merely by providing mountains

of documents to defense counsel who were left unguided as to which documents would be

proven falsified or which of some fifteen burglaries would be demonstrated to be staged.");

*Rajaratnam*, 2010 WL 2788168, at *2 ("[T]he government may not rely solely on the quantity of

information disclosed; sometimes, the large volume of material disclosed is precisely what

necessitates a bill of particulars.") (internal citation omitted).  Here, if anything, the fact that the

---

[9]   On June 2, 2021, months after the court-ordered discovery deadline passed, the government
dumped an additional entirely unindexed 3,140 documents, consisting of 38,240 pages, on
Dr. Sarshar.  *See* Weitzman Decl. Ex. 15.

Government has "inundate[d] the defense team with numerous files to sift through" militates *in favor* of a bill of particulars. *United States v. Blakstad*, 2020 WL 5992347 (S.D.N.Y. Oct. 9, 2020). Because the Indictment lacks the details necessary for Dr. Sarshar to prepare a defense, the Court should order the Government to produce a bill of particulars identifying: (1) the MNPI that Dr. Sarshar allegedly communicated to each of the four Associates identified in the Indictment, and (2) when and how Dr. Sarshar allegedly became aware of this MNPI; (3) when and how Dr. Sarshar allegedly communicated the MNPI to each alleged tippee; and (4) for which trades allegedly based on MNPI the Government seeks to hold Dr. Sarshar liable

### C.   The Court Should Strike Prejudicial and Irrelevant Language in the Indictment as Mere Surplusage.

Federal Rule of Criminal Procedure 7(d) provides that "[u]pon the defendant's motion, the court may strike surplusage from the indictment or information." This rule "protect[s] the defendant against immaterial or irrelevant allegations in an indictment or information, which may . . . be prejudicial." Fed. R. Crim. P. 7(d), advisory committee's note on 1944 enactment; *see also* Wright & Miller 1 Fed. Prac. & Proc. Crim. § 128 (4th ed. 2021) ("The purpose of 7(d) is to protect the defendant against prejudicial allegations of irrelevant or immaterial facts.") District courts are "allowed wide discretion" to strike prejudicial surplusage from an indictment. *United States v. Mahaffy*, 446 F. Supp. 2d 115, 118 (E.D.N.Y. 2006).

"Motions to strike surplusage from an indictment will be granted," for example, "where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial." *United States v. Mulder*, 273 F.3d 91, 99-100 (2d Cir. 2001). "Indirect expressions, implied allegations, argumentative statements, and uncertainty due to generalizations in language are defects in an indictment" that should be stricken. *United States v. Williams*, 203 F.2d 572, 574 (5th Cir. 1953).

Here, certain paragraphs in the Indictment contain allegations that are "are not relevant to the crime charged" and are thus "inflammatory and prejudicial." *Mulder*, 273 F.3d at 99. Most notably, in paragraphs 10, 24, 42, and 51-57, the Indictment alleges that Dr. Sarshar lied to FINRA about his contacts with certain individuals in the weeks leading up to the Teva acquisition. These allegations are irrelevant, as the government is not charging Dr. Sarshar with obstruction or making false statements to FINRA. And in any event, the allegations that Dr. Sarshar "lied" to FINRA are unfounded. According to the Indictment, Dr. Sarshar stated in an email in September 2015 that he "could not recall" communicating with certain individuals between February 2, 2015 and March 27, 2015. Indict. ¶ 10; *see also id.* ¶¶ 24, 42, 54b, 55b, 56b, 57. But Dr. Sarshar sent this response only approximately 90 minutes after receiving the email about FINRA's inquiry, without checking his email or phone records. And it is hardly surprising that he could not remember conversations during a specific seven-week period six months earlier. The suggestion that Dr. Sarshar made deliberately false statements to FINRA is highly prejudicial, unfounded, and irrelevant, and the paragraphs relating to the FINRA responses should be stricken from the Indictment. *See United States v. Edwards*, 473 F. App'x 429, 435 (6th Cir. 2012) ("not being able to recall what happened is not the same as lying about the events"); *United States v. Nealy*, 2016 WL 3660266, at *2 (A. Ct. Crim. App. June 30, 2016), aff'd, (C.A.A.F. May 4, 2017) ("The fact that one does not remember something does not transform the lack of recollection to a false official statement").

Furthermore, in several places in the Indictment, the government relies on "implied allegations" and "generalizations in language" to fill glaring holes in its case. *Williams*, 203 F.2d at 574. For example, in paragraphs 42 and 43, the Indictment alleges Dr. Sarshar contacted Associate-3 on March 6, 2015, allegedly to share MNPI about a confidentiality agreement signed

by Auspex and a company other than Teva.  But there are no allegations that Dr. Sarshar learned

about this agreement on March 6, nor that he discussed the agreement during his conversations

with Associate-3.  Without these critical details, the Indictment fails to explain how the

allegations in paragraphs 42 and 43 are even relevant to the charged offenses .

Moreover, the mere fact that Auspex entered into a confidentiality agreement with

another company is irrelevant and unfairly prejudicial.  As a matter of law, the existence of such

an agreement is too preliminary and speculative to constitute "material, non-public information"

to support a securities fraud or tender offer fraud charge.  *Taylor*, 857 F.2d at 244 (materiality

element not met where discussions relating to acquisition are "preliminary, contingent, and

speculative"); *In re Columbia Pipeline, Inc.*, 405 F. Supp. 3d 494, 520 (S.D.N.Y. 2019) (mere

existence of non-disclosure agreements containing standstill provisions "is not material").  At

most, the existence of a confidentiality agreement signals that Auspex and another company

entered into an agreement to exchange confidential information concerning a *potential* deal; it

says nothing about whether an acquisition was *likely*, and indeed, the Indictment alleges that the

other party to the non-disclosure agreement was a "suitor different from Teva."  Indict. ¶ 42; *see*

*also Panfil*, 768 F. Supp. at 58 ("mere 'intention' to pursue a possible merger at some time" is

not material).  Because the existence of a confidentiality agreement could not have constituted

"material" non-public information, and because there are no allegations Dr. Sarshar even knew

about the agreement or communicated its existence to Associate-3, the allegations in paragraphs

42 and 43 are irrelevant and inflammatory and should be stricken.

Other allegations are similarly defective because they rest on unfounded speculation.  In

paragraphs 44 through 45, for example, the Indictment alleges Associate-4 purchased shares of

Auspex stock three days after a conversation with Dr. Sarshar on February 10, 2015, following

meetings in Israel between Auspex and Teva executives on February 9 and 10.  But Dr. Sarshar did not attend those meetings in Israel and the Indictment does not allege that he knew anything about them, or even that Dr. Sarshar disclosed to Associate 4 any details regarding those meetings—details he, in fact, had no knowledge of.  With no connection to any inside information, Associate-4's trading on that date is simply irrelevant.

Similarly, in paragraphs 30 through 32, the Indictment alleges that, on February 24, 2015, Associate-2 "called the administrator of her Section 401(k) plan" to move funds into a self-directed brokerage account "through which she would subsequently purchase Auspex" shares. Indict. ¶ 31.  The Indictment alleges Associate-2 took these steps after exchanging text messages with Dr. Sarshar on February 24, 2015, "the same day Teva submitted to Auspex its non-binding proposal to acquire Auspex for a range of $85-$95 per share."  *Id.* ¶ 30.  The government alleges these supposedly key text exchanges occurred between 9:10 and 9:31 a.m. PT.  While the Indictment apparently attempts to rely on the timing of Dr. Sarshar's text messages to imply he shared MNPI with Associate-2, presumably about the non-binding proposal Teva had sent that same day, the Indictment rests on flawed assumptions. ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮    It is therefore no surprise that the Indictment does not allege that Dr. Sarshar was aware of the Teva tender offer on February 24, 2015, or that he communicated the Teva offer to Associate-2. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Without

connecting the dots, the allegations in paragraphs 30 through 32 are entirely irrelevant and unfairly prejudicial.

Finally, paragraph 26 alleges that on "the morning of March 17, 2015," Dr. Sarshar "called Associate-1" for approximately 13 minutes. Later that day, "a close family member of Associate 1's, who had not previously owned or traded in Auspex," allegedly "purchased 500 shares of Auspex stock." Indict. ¶ 26. Even assuming the Indictment adequately alleges Dr. Sarshar could have shared MNPI with Associate-1 on March 17, there is no basis for concluding Associate-1 passed on that information to the "close family member" who traded in Auspex. There is no allegation that Associate-1 and the family member communicated on March 17, let alone that Associate-1 disclosed MNPI allegedly received from Dr. Sarshar. These allegations are also prejudicial and should be stricken from the Indictment.

In addition, courts routinely strike extraneous language in an indictment that might "impermissibly expand[] the charge[s]" against the defendant. *United States v. Kassir*, 2009 WL 995139, at *3 (S.D.N.Y. Apr. 9, 2009). In *United States v. Pope*, for example, the court granted the defendants' motion to strike the phrase "among other things," based on the danger such language would "permit the prosecution to go beyond the specific charge" in the indictment, and that the defendants "may finally be prosecuted and convicted on charges . . . not considered by the grand jury." 189 F. Supp. 12, 25- 26 (S.D.N.Y. 1960). And in *United States v. Mango*, the court struck the phrases "among other things" and "among others" because "this language would allow the jury to draw the inference that defendants are accused of crimes not charged in the Indictment." 1997 WL 222367, at *16 (N.D.N.Y. May 1, 1997); *see also Kassir*, 2009 WL 995139, at *3 (striking "among other things" from a charging paragraph with the government's consent); *United States v. DeFabritus*, 605 F. Supp. 1538, 1547 (S.D.N.Y. 1985) (striking

"among other things"); *United States v. DePalma*, 461 F. Supp. 778, 798 (S.D.N.Y. 1978) (striking "and other activities").

So too here, extraneous language in certain paragraphs throughout the Indictment should be stricken to avoid juror confusion and provide Dr. Sarshar clear notice of the charges against him:

- Paragraph 10:  "*Among other things*, SARSHAR falsely stated that he could not recall having any contact with two of the Associates in the weeks preceding the public announcement of the Tender Offer when, in truth and in fact, and as SARSHAR well knew, he had extensive contact with these individuals, including communications regarding the confidential anticipated Tender Offer."  Indict. ¶ 10 (emphasis added).

- Paragraph 21:  On March 11, 2015, Dr. Sarshar "provided Associate-1 with confidential information regarding a possible tender offer for Auspex.  *This information included* that the Investment Bank, which SARSHAR named, was 'working on it,' referring to a potential sale of Auspex; that Auspex was having 'audits' done in anticipation of a possible sale of the Company; the price at which SARSHAR was willing to sell the Company; and that Associate-1 should 'absolutely' buy more Auspex stock."  Indict. ¶ 10 (emphasis added).

- Paragraph 24:  "*Among other things*, on or about March 11 and 12, 2015, SARSHAR exchanged e-mails with Associate-1 about a possible meeting on March 12, 2015, though it appears no meeting ultimately took place.  On or about March 13, 2015 and March 16, 2015, SARSHAR and Associate-1 exchanged additional text messages."  Indict. ¶ 24 (emphasis added).

The vague and ambiguous phrases "among other things" and "included" should be stricken because they could result in juror confusion or "allow the jury to draw the inference" that Dr. Sarshar committed wrongdoing other than what is specifically alleged in the Indictment. *Mango*, 1997 WL 222367, at *16.  For example, the use of "among other things" in paragraph 24 suggests Dr. Sarshar communicated inside information to Associate-1 other than in the March 11 and 12 emails referenced in the Indictment, even though the government provides no details whatsoever to support those allegations.  And in paragraph 10, "among other things" might suggest Dr. Sarshar made false statements other than what is directly alleged.  In paragraph 21, the use of "included" improperly suggests the specific confidential information listed was not the *only* "confidential information regarding a possible tender offer" referred to in the preceding sentence that Dr. Sarshar allegedly communicated.  As other courts have recognized, the phrases "among other things" and "included" should be stricken to avoid the danger that the charges returned by the grand jury are impermissibly enlarged at trial.  *See, e.g.*, *Pope*, 189 F. Supp. at 26, *DeFabritus*, 605 F. Supp. at 1547; *DePalma*, 461 F. Supp. at 798–99. (striking "and other activities" because it "adds nothing to the charges, gives the defendant no further information with respect to them, and creates the danger that the prosecutor at trial may impermissibly enlarge the charges contained in the Indictment"); *United States v. Freeman*, 619 F.2d 1112, 1118 (5th Cir. 1980) (stating that the phrase "'included, but were not limited to' . . . should have [been] treated . . . as surplusage").

The Court should strike as surplusage the irrelevant, unsupported allegations in paragraphs 10, 24, 26, 30-32, 42-45, and 51-57 of the Indictment, and extraneous language (such as "including," "included," and "among others") in paragraphs 9, 10, 21, 22, and 24.

### III.    CONCLUSION

For the foregoing reasons, we respectfully request that the Court:  (i) dismiss the

Indictment as duplicitous; (ii) order the government to provide a bill of particulars; and (iii)

strike the prejudicial surplusage in the Indictment.


Dated:    New York, New York          By:      */s/ Avi Weitzman*
          July 1, 2021

                                      GIBSON, DUNN & CRUTCHER LLP
                                      AVI WEITZMAN
                                      REED BRODSKY
                                      200 Park Avenue
                                      New York, NY 10166
                                      Telephone:  212.351.4000
                                      Facsimile:  212.351.4035

                                      *Counsel for Defendant Sepehr Sarshar*