UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                                                     :

UNITED STATES OF AMERICA

                                                     :

          - v. -

                                                       :     21 Cr. 202 (GHW)

SEPEHR SARSHAR,

                                                     :

                           Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**THE GOVERNMENT'S MEMORANDUM IN OPPOSITION TO
THE DEFENDANT'S MOTION TO DISMISS THE INDICTMENT, COMPEL THE
PRODUCTION OF A BILL OF PARTICULARS, AND STRIKE SURPLUSAGE**

AUDREY STRAUSS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Negar Tekeei
Daniel Tracer
Assistant United States Attorneys
     *- Of Counsel -*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................ 1

RELEVANT BACKGROUND ............................................................................... 2

ARGUMENT .......................................................................................................... 7

I.   Counts One and Two of the Indictment are Not Duplicitous ...................... 7

    A.  Applicable Law.......................................................................................... 7

    B.  Discussion.................................................................................................. 8

II.  The Defendant's Motion for a Bill of Particulars Should Be Denied ........... 15

    A.  Applicable Law........................................................................................ 16

    B.  Discussion................................................................................................ 20

III. There Is No Basis to Strike Any Portion of the Indictment ......................... 27

    A.  Applicable Law........................................................................................ 28

    B.  Discussion................................................................................................ 29

CONCLUSION ................................................................................................... 35

# TABLE OF AUTHORITIES

**CASES**

*Hemphill v. United States*,
  392 F.2d 45 (8th Cir. 1968) ................................................................................ 19

*United States v. Ahmed*,
  No. 10 Cr. 131 (PKC), 2011 WL 5041456 (S.D.N.Y. Oct. 21, 2011)................................... 29

*United States v. Alacri*,
  968 F.2d 1512 (2d Cir. 1992).............................................................................. 8

*United States v. Bellomo*,
  263 F. Supp. 2d 561 (E.D.N.Y. 2003) .................................................................. 19

*United States v. Bin Laden*,
  91 F. Supp. 2d 600 (S.D.N.Y. 2000)...................................................................... 28

*United States v. Blakstad*,
  No. 19 CR. 486 (ER), 2020 WL 5992347 (S.D.N.Y. Oct. 9, 2020) .................................. 24, 25

*United States v. Booth*,
  No. 99 CR. 378 LBS, 1999 WL 1192317 (S.D.N.Y. Dec. 14, 1999)........................................ 33

*United States v. Butler*,
  351 F. Supp. 121 (S.D.N.Y. 2004)........................................................................ 29

*United States v. Carboni*,
  204 F.3d 39 (2d Cir. 2000).................................................................................. 30

*United States v. Casamento*,
  887 F.2d 1141 (2d Cir.1989).............................................................................. 31

*United States v. Chovanec*,
  467 F.Supp. 41 (S.D.N.Y. 1979).......................................................................... 33

*United States v. Contorinis*,
  692 F.3d 136 (2d Cir. 2012)................................................................................ 26

*United States v. Contorinis*,
  9 Cr. 1083 (RJS) ........................................................................................ 25, 26

*United States v. Cotton*,
  535 U.S. 625 (2002)...................................................................................... 8

*United States v. Crisci*,
 273 F.3d 235 (2d Cir. 2001)..................................................................................... 8

*United States v. Cusimano*,
 123 F.3d 83 (2d Cir. 1997)...................................................................................... 26

*United States v. Daley*,
 454 F.2d 505 (1st Cir. 1972) ................................................................................... 11

*United States v. DePalma*,
 461 F. Supp. 778 (S.D.N.Y. 1978) ..................................................................... 28, 33

*United States v. Dioguardi*,
 492 F.2d 70 (2d Cir. 1974)...................................................................................... 12

*United States v. Edwards*,
 342 F.3d 168 (2d Cir. 2003)................................................................................... 30

*United States v. Ferrarini*,
 9 F. Supp. 2d 284 (S.D.N.Y. 1998)......................................................................... 21

*United States v. Gibson*,
 175 F. Supp. 2d 532 (S.D.N.Y. 2001)..................................................................... 19

*United States v. Gonzalez*,
 110 F.3d 941 (2d Cir. 1997).................................................................................... 30

*United States v. Halloran*,
 664 F. App'x 23 (2d Cir. 2016) .............................................................................. 29

*United States v. Henry*,
 861 F. Supp. 1190 (S.D.N.Y. 1994)............................................................. 17, 19, 20

*United States v. Hernandez*,
 85 F.3d 1023 (2d Cir. 1996).................................................................................... 29

*United States v. Hinton*,
 127 F. Supp. 2d 548 (D.N.J. 2000) ........................................................................ 10

*United States v. Jimenez*,
 824 F. Supp. 351 (S.D.N.Y. 1993).......................................................................... 28

*United States v. Kassir*,
 No. S2 04 CR. 356 (JFK), 2009 WL 995139 (S.D.N.Y. Apr. 9, 2009)............... 32, 33

ii

*United States* v. *Kazarian*,
  2012 WL 1810214 (S.D.N.Y. 2012)................................................................ 18

*United States* v. *Kearney*,
  451 F. Supp. 33 (S.D.N.Y. 1978)...................................................... 10, 11, 12

*United States* v. *Kurniawan*,
  627 Fed. Appx. 24 (2d Cir. 2015).............................................................. 11

*United States* v. *LaFlam*,
  369 F.3d 153 (2d Cir. 2004)...................................................................... 30

*United States* v. *Leonelli*,
  428 F. Supp. 880 (S.D.N.Y. 1977).............................................................. 18

*United States* v. *Mahabub*,
  2014 WL 4243657 (S.D.N.Y. Aug. 26, 2014)........................................ 18, 19

*United States* v. *Mandell*,
  710 F. Supp. 2d 368 (S.D.N.Y. 2010)................................................... 18, 22

*United States* v. *Mango*,
  No. 96-CR-327, 1997 WL 222367 (N.D.N.Y. May 1, 1997)............................ 33

*United States* v. *Marcus*,
  628 F.3d 36 (2d Cir.2010).......................................................................... 16

*United States* v. *Margiotta*,
  646 F.2d 729 (2d Cir. 1981)......................................................................... 8

*United States* v. *Mayo*,
  230 F. Supp. 85 (S.D.N.Y. 1964)................................................................ 32

*United States* v. *Mitlof*,
  165 F. Supp. 2d 558 (S.D.N.Y. 2001)............................................ 18, 19, 26

*United States* v. *Moloney*,
  287 F.3d 236 (2d Cir. 2002)................................................................... 8, 12

*United States* v. *Monserrate*,
  2011 WL 3480957 (S.D.N.Y. 2011).............................................................. 17

iii

*United States v. Mostafa*,
965 F. Supp. 2d 451 (S.D.N.Y. 2013) ...................................................... 29

*United States v. Mulder*,
273 F.3d 91 (2d Cir. 2001) ...................................................................... 28

*United States v. Munoz-Franco*,
986 F. Supp. 70 (D.P.R. 1997) ........................................................... 10, 14

*United States v. Murgio*,
209 F. Supp. 3d 698 (S.D.N.Y. 2016) ...................................................... 28

*United States v. Murray*,
618 F. 2d 892 (2d Cir. 1980) ................................................................... 8

*United States v. Nacchio*,
2006 WL 2475282 (D. Colo. Aug. 25, 2006) ........................................... 25

*United States v. Nachamie*,
91 F. Supp. 2d 565 (S.D.N.Y. 2000) ........................................................ 18

*United States v. Napolitano*,
552 F. Supp. 465 (S.D.N.Y. 1982) ........................................................... 28

*United States v. Olmeda*,
461 F.3d 271 (2d Cir. 2006) ........................................................ 8, 11, 15

*United States v. Paulino*,
445 F.3d 211 (2d Cir. 2006) .................................................................... 30

*United States v. Pinto-Thomaz*,
352 F. Supp. 3d 287 (S.D.N.Y. 2018) ................................................. 24, 25

*United States v. Pope*,
189 F. Supp. 12 (S.D.N.Y. 1960) ............................................................. 32

*United States v. Rajaratnam*,
719 F.3d 139 (2d Cir. 2013) ........................................................... 24, 25

*United States v. Rittweger*,
259 F. Supp. 2d 275 (S.D.N.Y. 2003) ...................................................... 18

*United States v. Samsonov*,
2009 WL 176721 (S.D.N.Y. 2009) ........................................................... 17

iv

*United States v. Scarpa*,
   913 F.2d 993 (2d Cir. 1990)..............................................................................28, 29

*United States v. Schlei*,
   122 F.3d 944 (11th Cir. 1997) ...................................................................... 12

*United States v. Smith*,
   985 F. Supp. 2d 547 (S.D.N.Y. 2014)............................................................. 29

*United States v. Stewart*,
   No. 15 Cr. 287 (S.D.N.Y. Jan. 19, 2016) .................................................17, 25

*United States v. Sturdivant*,
   244 F.3d 71 (2d Cir. 2001)...........................................................................7, 8

*United States v. Svoboda*,
   347 F.3d 471 (2d Cir. 2003)............................................................................. 13

*United States v. Torres*,
   901 F.2d 205 (2d Cir. 1990)......................................................................16, 17

*United States v. Trippe*,
   171 F. Supp. 2d 230 (S.D.N.Y. 2001) ............................................................ 17

*United States v. Tutino*,
   883 F.2d 1125 (2d Cir. 1989) ............................................................................. 8

*United States v. Vilar*,
   729 F.3d 62 (2d Cir. 2013).................................................................................. 8

*United States v. Walker*,
   254 F. App'x 60 (2d Cir. 2007) ...................................................................... 11

*United States v. Walsh*,
   194 F.3d 37 (2d Cir. 1999)................................................................................ 16

*United States v. Washington*,
   947 F.Supp. 87 (S.D.N.Y. 1996)...................................................................... 33

*United States v. Wey*,
   No. 15-CR-611 (AJN), 2017 WL 237651 (S.D.N.Y. Jan. 18, 2017)....................... 13

*United States v. William Walters,*
  *a/k/a "Billy,"* No. 16 Cr. 338 (PKC) ........................................................... 25

*United States v. Zackson,*
  12 F.3d 1178 (2d Cir. 1993) ...................................................................... 30

*Zafiro v. United States,*
  506 U.S. 534 (1993) ................................................................................... 34

## STATUTES

15 U.S.C. § 78ff .............................................................................................. 12

15 U.S.C. § 78n(e) .......................................................................................... 12

17 C.F.R. § 240.14e-3 (a) .............................................................................. 12

17 C.F.R. § 240.14e-3 (d) .............................................................................. 12

18 U.S.C. § 1348 ............................................................................................. 11

18 U.S.C. § 2 ................................................................................................... 12

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in opposition to the defendant's motions (i) to dismiss the Indictment as duplicitous, (ii) compel the production of a bill of particulars, and (iii) strike "surplusage" from the language of the Indictment. Dkt. Nos. 40, 41, & 42.[1] All of these motions are meritless and should be denied.

Over the course of approximately three months in early 2015, the defendant repeatedly placed his interests in enriching his family and friends over and above his duty to protect and maintain the confidentiality of all material and non-public information that he learned by virtue of his position as a board member of Auspex Pharmaceuticals, Inc. ("Auspex"). The defendant had been a co-founder of Auspex and, from early on, procured investments in Auspex from his friends and family. Throughout his tenure on Auspex's executive management team, Auspex experienced financial instability and repeatedly sought additional funding from early retail investors, like the defendant's friends and family, and private firms. After the defendant entered into a separation agreement with Auspex in approximately 2009, he secured a seat on its board of directors. Steered by new management, Auspex began trading publicly in February 2014, and entertaining the prospect of a strategic acquisition by January 2015. In early 2015, privy to confidential information about an offer by Teva Pharmaceutical Industries Ltd. ("Teva") to acquire Auspex, and aware of the confidential steps Auspex was taking to prepare for an acquisition by Teva and potentially other suitors, the defendant repeatedly chose to share that material, non-public information with his friends and family, causing them to trade in securities based on it, all in breach of his duties to Auspex.

---

[1] "Dkt. No." refers to an entry in the docket in this case, 21 Cr. 202 (GHW), unless otherwise indicated; and "Indict." refers to the Indictment in this case, Dkt. No. 15.

In his pretrial motions practice, the defendant raises arguments that, when scrutinized, find little support in fact or law.

*First*, the Indictment properly charges a single, overarching scheme by the defendant to enrich a single group of his family and friends, in breach of his duties to a single victim, Auspex, and the provision of material, non-public information about a single topic, all of which occurred within a relatively short time span of approximately three months. The Indictment is not duplicitous.

*Second*, the defendant, who has the benefit of a detailed, 29-page Indictment, a 20-page complaint, and substantial discovery, including multiple lengthy search warrant affidavits, and early disclosures of Jencks Act materials, has more than sufficient information to understand the charges against him and to prepare a defense. The defendant is not entitled to a bill of particulars and should not be allowed to unduly restrict the Government's ability to present its case.

*Third*, the Indictment is properly pled and there is no basis to strike any portion of it as surplusage.

For these reasons and the reasons that follow, the motions should be denied in their entirety.

## RELEVANT BACKGROUND

As described in the detailed, 29-page Indictment in the Criminal Case (21 Cr. 202, Dkt. No. 15 (the "Indictment")), the defendant was a founder of Auspex Pharmaceuticals, Inc. ("Auspex"), a San Diego-based company focused on the development of novel medicines for "orphan diseases" that traded under the symbol ASPX on the NASDAQ. Indict. ¶¶ 1, 3. The defendant previously served as Auspex's president, chief executive officer, and chief technology officer, and, at all times relevant to the Indictment, the defendant was a member of Auspex's board

of directors.  *Id.*[2]  The Government expects the evidence at trial will show that the defendant entered into a separation agreement with Auspex in 2009, under which his employment with Auspex was terminated, but secured a seat on Auspex's board of directors left empty by the resignation of his close family friend.  As a member of Auspex's board of directors, the defendant had a duty to protect and maintain the confidentiality of all material non-public information ("MNPI") that he learned through the course of his work, and to refrain from using that information for his own benefit.  *Id.* ¶ 11.

From in or about January through March 2015, the defendant learned MNPI about an offer by Teva to acquire Auspex by virtue of his position as an Auspex board member.  In particular, on or around January 15, 2015, Teva, an Israel-based global pharmaceutical company, first expressed an interest in a potential acquisition of Auspex.  *Id.* ¶¶ 2, 14.  Over the following weeks, Auspex management engaged in calls and meetings with representatives of Teva to discuss the potential acquisition.  *Id.* ¶ 15.  For example, on February 9 and 10, 2015, Auspex senior management participated in a meeting with senior executives from Teva in Israel where they discussed, among other things, Teva's strong interest in acquiring Auspex.  *Id.* ¶ 44.  On February 16 and 17, 2015, Auspex held a board of directors meeting, attended by the defendant, at which Teva's interest in acquiring Auspex was discussed.  *Id.* ¶ 16.  On February 24, 2015, Teva made a non-binding proposal to acquire Auspex in the range of $85-95 per share.  *Id.* ¶ 18. During that time, Auspex was also negotiating with other potential acquirors, and on March 6,

---

[2] The Government expects the evidence at trial will show that the defendant entered into a separation agreement with Auspex in 2009.  Although the defendant was no longer a member of Auspex's executive management team, he was able to assume a position on Auspex's Board of Directors when a close family friend of his, who was also an early investor in Auspex, stepped down from the board.

2015, Auspex entered into a confidentiality agreement with another potential acquiror, other than Teva. *Id.* ¶ 42.

Going into March 2015, Auspex continued to discuss and consider Teva's offer. For example, on March 11, 2015, the defendant participated in an Auspex audit committee meeting, which included a discussion of the proposed tender offer. *Id.* ¶ 19. On March 17, 2015, the defendant participated in yet another Auspex board meeting to discuss potential acquisitions, during which the board indicated that it would not be interested in an offer for less than the upper range of Teva's offer. *Id.* ¶ 25. On March 24, 2015, representatives of Teva informed Auspex's CEO that Teva would likely be proposing a transaction in the upper end of their $85-95 offer. *Id.* ¶ 38. Auspex's CEO had a 39-minute call with the defendant the following day. *Id.* ¶ 39. On March 26, 2015, Auspex's CEO learned that Teva had received internal approval to proceed with an acquisition and that Teva could offer up to $100 per share. *Id.* ¶ 28.

On March 30, 2015, Auspex and Teva issued a joint press release, containing the first public announcement that Teva would commence a tender offer for all outstanding shares of Auspex at a price of $101 per share. *Id.* ¶ 12. Following that announcement, Auspex's stock rose from approximately $70.91 per share to $100.36, a jump of approximately 41%. *Id.* ¶ 13.

While the defendant was in receipt of the above-described MNPI about Teva's interest in acquiring Auspex, the Indictment alleges that the defendant shared that MNPI with friends and a family member who then traded in Auspex based on the MNPI or otherwise caused those friends and family to trade in Auspex. For example, shortly after the defendant attended the board of directors meeting on February 16 and 17 that involved a discussion of Teva's interest in an acquisition, the defendant exchanged text messages with a close friend ("Associate-1"). *Id.* ¶ 17. Shortly thereafter, on February 20, 2015, Associate-1 purchased approximately 500 shares of

Auspex stock. *Id.* Later, on March 11, 2015, after participating in the March 11 Auspex audit committee meeting, the defendant again exchanged text messages and a call with Associate-1 and provided Associate-1 with MNPI about the Teva offer, including encouraging Associate-1 to "absolutely" buy more Auspex stock. *Id.* ¶¶ 20-21. Associate-1 in turn shared that MNPI with another individual who was a friend of both the defendant and Associate-1 (the "CW"), who purchased more than 1,000 shares of Auspex between in or about March 12 and March 16. *Id.* ¶¶ 22-23. Similarly, on March 17, 2015, after the March 17 Auspex board meeting, the defendant called Associate-1, following which a family member of Associate-1 purchased approximately 500 shares of Auspex. *Id.* ¶ 26. On March 26, 2015, after Teva had received internal approval to offer up to $100 per share, Associate-1 purchased thousands of additional shares of Auspex. *Id.* ¶ 29. Associate-1 subsequently sold thousands of shares after Teva's tender offer was announced on March 30 and tendered over 12,000 shares pursuant to the tender offer, thereby reaping hundreds of thousands of dollars in profits. *Id.* The CW also made thousands of dollars of profits from selling shares that the CW had bought following his receipt of MNPI from Associate-1 on or about March 11. *Id.*

Similarly, after learning about MNPI related to Teva's acquisition of Auspex, the defendant shared that MNPI with his girlfriend ("Associate-2"), another friend ("Associate-3"), and a close relative ("Associate-4"). For example, on February 24, 2015, after Teva made its $85-95 per share proposal, the defendant exchanged text messages with Associate-2. *Id.* ¶ 30. That same day, Associate-2 began moving funds from her 401(k) account to a self-directed brokerage account in order to be able to buy and sell stocks. *Id.* ¶ 31. Associate-2 completed that process on February 27, 2015 and purchased approximately 750 shares of Auspex stock. *Id.* ¶ 35. Likewise, on March 25, 2015, after Auspex's CEO had learned of Teva's intention to make an

offer in the high end of its $85-95 proposal and the defendant participated in a 39-minute call with Auspex's CEO, the defendant called Associate-2. *Id.* ¶ 39. Minutes after that call, Associate-2 purchased an additional approximately 75 shares in Auspex and texted the defendant to let him know about that purchase. *Id.* During that same period, Associate-2 also communicated with a friend and co-worker (the "Co-Worker") who purchased Auspex stock with substantially similar timing and amounts as Associate-2. *Id.* ¶¶ 33-34, 36-37. Both Associate-2 and the Co-Worker made thousands of dollars in profit after tendering Auspex shares they had previously purchased pursuant to Teva's tender offer. *Id.* ¶ 41.

Finally, on February 10, 2015, the second day of Auspex's senior management trip to Israel, the defendant called Associate-4. *Id.* ¶ 45. Three days later, on February 13, Associate-4 purchased approximately 9,000 shares of Auspex. *Id*. Later, on February 17, 2015, the second day of Auspex's two-day board meeting that the defendant attended, the defendant called Associate-4. *Id.* ¶ 46. Shortly after that call, Associate-4 purchased thousands of Auspex shares and Associate-4's domestic partner purchased hundreds of shares. *Id.* ¶¶ 46-47. Likewise, on March 25, 2015, after the defendant participated in a 39-minute call with Auspex's CEO after the CEO had learned of Teva's intention to make an offer in the high end of its $85-95 proposal, Associate-4 and his domestic partner purchased thousands of additional shares of Auspex. *Id.* ¶ 49. As a result of selling and tendering the Auspex shares they had purchased, Associate-4 and his domestic partner made thousands of dollars in profits. *Id.* ¶ 50.

On September 11, 2015, the defendant lied to FINRA about his communications with some of the above-mentioned individuals. In particular, in or about August 2015, FINRA asked the defendant whether he had any contact with Associate-1, Associate-3, and Assocate-4 between February 2 and March 27, 2015, as part of its investigation into potential insider trading. *Id.* ¶¶

51-52.   In response, the defendant stated, among statements to FINRA, that (i) he did not recall having contact with Associate-1 during that period (*id.* ¶ 54); (ii) he did not recall having contact with Associate-3 during that period (*id.* ¶ 55); and (iii) he recalled having contact with Associate-4, but they did not discuss any topics related to Auspex (*id.* ¶ 56).   These statements to FINRA were inconsistent with the communications between the defendant and Associate-1, Associate-3, and Associate-4, as detailed in the Indictment.   In total, the defendant's friends and family earned at least approximately $700,000 as a result of this alleged insider trading scheme.

## ARGUMENT

### I.   Counts One and Two of the Indictment are Not Duplicitous

The defendant moves to dismiss Counts One and Two of the Indictment as duplicitous, arguing that they charge him with "four separate and distinct schemes: each a scheme between [the defendant] and the respective Associate."   Dkt. No. 41 at 18.   This argument is meritless, as each count explicitly charges a single continuing scheme by the defendant.   For the same reason, the defendant's motion to compel the Government to "elect one single scheme to pursue at trial" should be denied as moot.   Dkt. No. 41 at 18.

#### A.  Applicable Law

An indictment is impermissibly duplicitous if (1) it combines two or more distinct crimes into one count, in contravention of Federal Rule of Criminal Procedure 8, and (2) the defendant is thereby prejudiced.   *See United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001).   "[A]n indictment is not defective," however, "if it alleges 'in a single count . . . the commission of a crime by several means."   *United States v. Crisci*, 273 F.3d 235, 238-39 (2d Cir. 2001) (quoting *United States v. Murray*, 618 F. 2d 892, 896 (2d Cir. 1980)).   Duplicitous indictments can present three types of prejudice: (1) lack of notice of the crime charged and its maximum penalty; (2) the

possibility that a second trial on the same charge would not be barred by the Double Jeopardy Clause, and (3) potential uncertainty with respect to the jury's verdict and the sentencing implications of that verdict. *See Sturdivant*, 244 F.3d at 77-78.

That does not mean, however, that an indictment is prejudicial merely because it charges in one count what it could have charged in several; "acts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme." *United States v. Vilar*, 729 F.3d 62, 79 (2d Cir. 2013) (*citing United States v. Olmeda*, 461 F.3d 271, 281 (2d Cir. 2006)); *see also United States v. Moloney*, 287 F.3d 236, 240 (2d Cir. 2002) ("[T]his circuit has adopted a general rule that criminal charges may aggregate multiple individual actions that otherwise could be charged as discrete offenses as long as all of the actions are part of 'a single scheme.'") (citations omitted), *abrogated on other grounds by United States v. Cotton*, 535 U.S. 625 (2002). "As long as the essence of the alleged crime is carrying out a single scheme to defraud, then aggregation is permissible." *United States v. Tutino*, 883 F.2d 1125, 1141 (2d Cir. 1989); *see also United States v. Alacri*, 968 F.2d 1512, 1518 (2d Cir. 1992); *United States v. Margiotta*, 646 F.2d 729, 732-33 (2d Cir. 1981) (approving the inclusion of multiple fraudulent mailings used to carry out one overarching scheme in a single mail fraud charge). Thus, courts have routinely held that wide swaths of conduct may be encompassed in a single count so long as it relates to a single scheme.

## B. Discussion

Count One charges the defendant with securities fraud for "carr[ying] out a scheme to defraud Auspex by misappropriating, in breach of his duties to Auspex, MNPI regarding the Tender Offer and passing that MNPI to his friends and a family member so that they could make profitable securities trades based upon that MNPI, and otherwise causing them to purchase

securities based on that MNPI." Indict. ¶ 58. While the defendant provided MNPI regarding Auspex to multiple associates, his acts were unmistakably part of and in furtherance of a single overarching scheme by the defendant to defraud Auspex, and, in breach of his duties to Auspex, to enrich his family and friends. The defendant pursued this objective by passing Auspex MNPI to friends and family – a college friend (Associate-1), his then girlfriend (Associate-2), another long-time friend (Associate-3), and a close family member (Associate-4). However, just because the proof of the means and methods by which the defendant carried out his scheme involves multiple illegal tips to multiple people does not make Count One duplicitous. The defendant's engagement in the scheme alleged in Count One involved a single victim, the breach of a single duty, the provision of MNPI about a single topic, occurred within a relatively short time span, and an intention to benefit a single group of people, his friends and family. Accordingly, regardless of whether the Government *could* break down the activity into distinct crimes, there is nothing improper under Second Circuit law with charging one continuous scheme.

The same logic applies to Count Two. Count Two charges the defendant with fraud in connection with a tender offer for "pass[ing] MNPI regarding the Tender Offer to his friends and a family member so that they could make profitable securities trades based upon that MNPI, and otherwise caused them to purchase securities based upon that MNPI." Indict. ¶ 60. The Indictment thus alleges that the defendant, while in possession of MNPI about a tender offer obtained by Auspex, caused the purchase or sale of Auspex securities. The defendant's concerted efforts to cause multiple people to purchase Auspex stock in advance of the public announcement of the Tender Offer were all unmistakably part of and in furtherance of a single overarching scheme by the defendant to engage in fraudulent, deceptive, or manipulative acts or practices in connection with the Tender Offer in order to enrich and benefit his family and friends. As with Count One,

9

the fact that the defendant, while possessing MNPI regarding the Tender Offer, caused multiple people to purchase Auspex stock does not make Count Two duplicitous.

Thus, in arguing that Counts One and Two relate to "four separate and distinct schemes: each a scheme between [the defendant] and the respective Associate," Dkt. No. 41 at 18, the defendant ignores the fact that his acts – tipping his friends and family member and causing their trades – were part of a single continuing scheme. The allegations in the Indictment make clear that the defendant engaged in a single overarching scheme, which involved his pattern of passing MNPI to and causing the Associates to trade in the shares of Auspex in advance of the Tender Offer, and not four separate, distinct schemes involving each of the Associates. For this reason, the cases cited by the defendant in support of his motion are inapposite or readily distinguishable. *United States v. Hinton*, 127 F. Supp. 2d 548, 554-56 (D.N.J. 2000) (distinct frauds against multiple financial institutions); *United States v. Munoz-Franco*, 986 F. Supp. 70, 71-72 (D.P.R. 1997) (multiple conspiracies involving different sets of actors and transactions).

The defendant's reliance on *United States v. Kearney*, 451 F. Supp. 33 (S.D.N.Y. 1978) is similarly misplaced. There, the court concluded that two counts of obstruction of correspondence, in violation of Title 18, United States Code, Sections 1702 and 2, and one count of interception of wire communications, in violation of Title 18, United States Code, Sections 2511(1)(a), were duplicitous. *Id.* Each of the obstruction counts alleged that Kearney unlawfully took mail addressed to multiple addresses or multiple people, over a six-or-more-month time period. *Id.* at 35.

The court began by analyzing whether the charged statutes by their "very nature, contemplate that several separate transactions may form a single, continuing scheme, and may therefore be charged in a single count.'" *Id.* at 36 (quoting *United States v. Daley*, 454 F.2d 505,

509 (1st Cir. 1972) (alteration omitted)).  The court noted that neither statute prohibited a "scheme," *id.* at 36-37, and that prosecutions brought under Section 1702 were "based on the theory of either 'one letter-one count,' i.e., each taking of a single letter is charged in a single count, or 'one depository-one count,' i.e., each taking from a single depository, despite the amount of discrete pieces of mail involved, is charged in one count."  *Id.* at 36.

Here, of course, Count One charges securities fraud under Title 18, United States Code, Sections 1348 and 2, which, unlike Sections 1702 and 2511(1)(a), the statutes at issue in *Kearney*, criminalizes schemes.  *See* 18 U.S.C. § 1348 ("Whoever knowingly executes, or attempts to execute, a scheme or artifice . . ."); *cf. United States v. Kurniawan*, 627 Fed. Appx. 24, 27 (2d Cir. 2015) (summary order) (holding that mail-fraud count was not duplicitous where alleged string of mailings "'could be characterized as part of a single continuing scheme'" (quoting *United States v. Olmeda*, 461 F.3d 271, 281 (2d Cir. 2006)); *United States v. Walker*, 254 F. App'x 60, 61-63 (2d Cir. 2007) (summary order) (holding that bank-fraud count involving multiple banks and executions was not duplicitous where count "on its face charged a single scheme and which the government argued as such").[3]

---

[3] For this same reason, the Court should reject the defendant's suggestion that every transaction in all securities fraud cases must be charged as separate offenses.  *See* Dkt. No. 41 at 19.  The only Second Circuit case the defendant cites for this proposition – *United States v. Dioguardi* – held that two counts of an Indictment charging separate instances of fraudulent purchase confirmations involved activity that was "not necessarily in respect to the scheme as a whole," and, therefore, the district court was within its discretion to impose consecutive sentences for those crimes.  492 F.2d 70, 83 (2d Cir. 1974).  *United States v. Schlei*, the Eleventh Circuit case cited by the defendant, held that a count containing two securities offenses was duplicitous on the specific facts of that case, "where one of the charged offenses provide[d] an improper basis for prosecution in the district, and no unanimity charge was given."  122 F.3d 944, 979 (11th Cir. 1997).  The reasoning in *Dioguardi* and *Schlei* does not apply here, where the Indictment properly charges a single overarching scheme, consistent with the statutory authority, rather than distinct transactions.

Similar logic applies to Count Two, which charges fraud in connection with a tender offer, in violation of Title 15, United States Code, Sections 78n(e) & 78ff; Title 17, Code of Federal Regulations, Sections 240.14e-3(a) & 240.14e-3(d), and Title 18, United States Code, Section 2. The applicable statutory language makes it unlawful to "engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders." 15 U.S.C. § 78 n(e). In contrast to the statutes at issue in *Kearney*, which did not contemplate that a series of acts or transactions could form a single, continuing scheme, but instead targeted singular instances of prohibited conduct, *see Kearney*, 451 F. Supp. at 36-37, the offense charged in Count Two explicitly does *not* contemplate singular instances of prohibited conduct, instead criminalizing "fraudulent, deceptive, or manipulative *acts* or *practices*," 15 U.S.C. § 78 n(e) (emphasis added). Similarly, in the money laundering context, which is analogous here, the Second Circuit has squarely held that "a single money laundering count can encompass multiple acts providing that each act is part of a unified scheme" – even though the statute, like the tender offer fraud statute, does not explicitly criminalize "schemes" – such as an "extended sequence[] of acts designed to obscure the provenance of dirty money." *Moloney*, 287 F.3d at 241 (also noting that the Second Circuit "has adopted a general rule that criminal charges may aggregate multiple individual actions that otherwise could be charged as discrete offenses as long as all of the actions are part of a single scheme." (internal quotation marks and citations omitted)). Moreover, the tender offer fraud alleged in Count Two involves a single insider (the defendant), single issuer (Auspex), and single tender offer (the Teva offer), in stark contrast to tender offer fraud cases involving multiple tender offers and issuers, each of which form distinct tender offer fraud charges. *See, e.g.*, *United States v. Svoboda*, 347 F.3d 471, 475 (2d Cir. 2003) (defendant

convicted of thirteen individual securities and tender offer fraud counts related to tips about multiple securities and tender offers).

That is not to say that all cases involving the securities of distinct issuers must allege crimes in separate and distinct counts. In *United States v. Wey*, a case involving securities fraud, wire fraud, and money laundering counts, for example, the district court held that, "[w]hile the offenses charged may have targeted the securities of three distinct issuers, they are, as alleged by the Government, unmistakably part of and in furtherance of a *single overarching scheme* by [the defendant] to amass substantial, undisclosed equity ownership of publicly traded companies and then manipulate the price of those companies' securities to his own economic benefit." No. 15-CR-611 (AJN), 2017 WL 237651, at *3 (S.D.N.Y. Jan. 18, 2017). Thus, the "undeniable commonalities in purpose and execution across [the defendant's] alleged offenses amply support the conclusion that the conspiracy, securities fraud, wire fraud, and money laundering counts each charge[d] conduct that may be considered part of one integrated fraudulent scheme, notwithstanding the involvement of three different issuers." *Id.* at *4. So, too, here. The "undeniable commonalit[y] in purpose and execution across" the defendant's offense conduct amply supports the conclusion that his conduct should be considered part of one integrated fraudulent scheme, as alleged in the Indictment.

The defendant also argues that the "structure of the Indictment" indicates that multiple crimes are being charged. Dkt. No. 41 at 20. The defendant is wrong. The chronology of the defendant's passage of MNPI to his friends and family appears in the Indictment under the heading "**SARSHAR LEARNS MATERIAL NONPUBLIC INFORMATION RELATING TO THE TENDER OFFER AND PASSES IT ON TO HIS FRIENDS AND FAMILY**." Indict. at 7. The heading describes a single overarching scheme: the defendant learning about MNPI relating

to the tender offer and passing it on to his friends and family.   Under that heading, the Indictment alleges the means and methods by which the defendant carried out this scheme, including a chronology of his conduct organized by his tipping chains – the defendant's tips to Associate-1 (Indict. ¶¶ 14-29), the defendant's tips to Associate-2 (*id.* ¶¶ 30-41), the defendant's tips to Associate-3 (*id.* ¶ 42-43), and the defendant's tips to Associate-4 (*id.* ¶¶ 44-50).   This method of organizing the defendant's conduct makes sense in a case involving a *single* insider who operates a scheme to pass information regarding a *single* issuer to his friends and family.   Had the Indictment been disorganized or followed an illogical format, the defendant would almost certainly complain that it was confusing.

The lead case cited by the defendant in support of his argument that the "structure" of the Indictment alleges separate schemes is inapposite, as that case involved what were deemed to be distinct conspiracies involving different groups of people, different corporate entities, and unconnected transactions.  *See, e.g.*, *United States v. Munoz-Franco*, 986 F. Supp. 70, 72 (D.P.R. 1997).  *United States v. Gabriel*, also cited by the defendant, is similarly unavailing.  920 F. Supp. 498, 505 (S.D.N.Y. 1996), *aff'd*, 125 F.3d 89 (2d Cir. 1997).   In that case, the district Court did *not* dismiss a conspiracy count for duplicity even though it "appear[ed] to allege two distinct conspiracies and thus to offend the prohibition against combining multiple conspiracies within a single conspiracy count" because it could not conclude "on the basis of the pleadings alone that there is *no* set of facts falling within the scope of [the conspiracy count] that could warrant a reasonable jury in finding a single conspiracy."  *Id.* (observing that the Second Circuit "has repeatedly cautioned that the determination of whether a conspiracy is single or multiple is an issue of fact 'singularly' well suited to determination by a jury conspirators) (citations omitted)).

In any event, far from being prejudiced by what he claims to be duplicity, the Government's charging decisions actually inure to the defendant's benefit. *First*, including all Associates in one overarching scheme limits the maximum penalties the defendant faces. *See Olmeda*, 461 F.3d at 281. *Second*, it avoids the defendant's "portrayal to the jury as the perpetrator of multiple crimes." *Id.* (internal quotation marks and alteration omitted). *Third*, any risk of ambiguity – of which there is none – can be cured by appropriate jury instructions.[4]

For all these reasons, Counts One and Two charge a single overarching scheme, are not duplicitous – and certainly not prejudicially so – and the Court should deny the defendant's motion to dismiss them. For the same reasons, the Court should also reject the defendant's request to compel the Government to "elect one single scheme" to pursue at trial.

## II.     The Defendant's Motion for a Bill of Particulars Should Be Denied

The defendant moves for a bill of particulars identifying (1) the MNPI he communicated to the four Associates in the Indictment, (2) when and how he became aware of the MNPI he shared, (3) when and how he communicated the MNPI to his tippees, and (4) for which of the trades based on MNPI will be he held liable. Dkt. No. 41 at 23. The defendant, who now has the vast majority of the Government's Jencks Act and potential Jencks Act material more than eight months before trial, the benefit of a detailed, 29-page Indictment, a 20-page complaint, multiple lengthy search warrant affidavits which provide ample information regarding the four categories of particulars he now requests, and substantial discovery in the form of toll records,

---

[4] Closer to trial, the Government will propose jury instructions regarding unanimity, and a verdict form, which together will further ensure that there is no confusion or prejudice to the defendant. To be clear, for the reasons set forth above, the Government opposes a "special verdict form" that divides the single continuing scheme charged in Counts One and Two of the Indictment into multiple, separate schemes, as requested by the defendant. *See* Dkt. No. 41 at 6.

trading records, substantive email communications, and text message records, is effectively seeking the Government's final order of proof for a trial that is more than eight months away. The defendant should not be allowed to unduly restrict the Government's ability to present its case. The defendant, like all defendants, is entitled to sufficient information to understand the charges against him, to prepare a defense, and to protect against double jeopardy. However, the Government has provided such information, and much more, in the Indictment, extensive discovery, and pretrial filings, including this memorandum. The defendant will also receive trial exhibits, a witness list, and Jencks Act material reasonably in advance of trial (and has, in fact, already received most of the current Jencks Act material). As such, he has not established an entitlement to a bill of particulars under well-established governing case law.

## A.  Applicable Law

The proper purpose of a bill of particulars under Federal Rule of Criminal Procedure 7(f) is "to provide [a] defendant with information about the details of the charge against him if this is *necessary* to the preparation of his defense, and to avoid prejudicial surprise at trial." *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990), *abrogated on other grounds by United States v. Marcus*, 628 F.3d 36, 41 (2d Cir.2010) (emphasis added) (internal quotation mark omitted). "A bill of particulars is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (internal quotations omitted).

In exercising its broad discretion to determine whether the charges are "so general" that they require supplementing, the Court should consider not just the text of the Indictment, but also discovery and other information supplied to the defendant to date. *See Torres*, 901 F.2d at 234 (affirming denial of request for bill of particulars where defendants had "been provided with a

wealth of evidentiary detail from the discovery to date, including electronic intercepts, search evidence and exhaustive supporting affidavits") (internal citation omitted); *United States v. Stewart*, No. 15 Cr. 287 (S.D.N.Y. Jan. 19, 2016) (Dkt. No. 64, at 21) (denying request for a bill of particulars in an insider trading case where the information already proffered was sufficient to enable the defendant to prepare for trial); *United States v. Monserrate*, 2011 WL 3480957, at *4 (S.D.N.Y. 2011) (denying request for bill of particulars where discovery materials and indictment were "sufficient to apprise the defendant of the charge against him" and to allow him to prepare for trial); *United States v. Samsonov*, 2009 WL 176721, at *4 (S.D.N.Y. 2009) (denying bill of particulars request where indictment, discovery letters, and discovery materials gave defendant adequate information to prepare for trial); *United States v. Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001) (denying bill of particulars request in stock fraud case where indictment was 15 pages long and substantial discovery had been provided); *United States v. Henry*, 861 F. Supp. 1190, 1198 (S.D.N.Y. 1994) ("In determining whether to grant a motion requesting a bill of particulars, the Court must ascertain whether the information sought has been provided elsewhere, such as through pre-trial discovery, voluntary disclosure by the government, or the indictment itself.").

Although the Government's provision of "mountains of documents to defense counsel who [a]re left unguided as to which documents" are relevant to the charges does not substitute for a bill of particulars where one would otherwise be required, *see United States v. Bortnovsky*, 820 F.2d 572, 575 (2d Cir. 1987), *United States v. Nachamie*, 91 F. Supp. 2d 565, 571 (S.D.N.Y. 2000), the provision of voluminous discovery in combination with some guidance about what is most relevant can vitiate a need for further particulars, *see, e.g.*, *United States v. Kazarian*, 2012 WL 1810214, at *25 (S.D.N.Y. 2012); *United States v. Mandell*, 710 F. Supp. 2d 368, 385 (S.D.N.Y. 2010)

(denying request for particularization of alleged misrepresentations where the indictment was 34 pages long and Government had provided voluminous, organized discovery).   In no event should volume of discovery alone warrant a bill of particulars; "[w]hile [a] [c]ourt may sympathize with counsel's task of reviewing a large quantity of materials that continue to be produced," that concern is addressed by granting the defense sufficient time in which to conduct the review in advance of trial.   *See United States v. Levy*, 2013 WL 664712, at *13 (S.D.N.Y. 2013).

A bill of particulars would undoubtedly be helpful to the defense in any case.   But "the law does not impose upon the Government an obligation to preview its case or expose its legal theor[ies]," *United States v. Leonelli,* 428 F. Supp. 880, 882 (S.D.N.Y. 1977), and therefore "[t]he ultimate test must be whether the information sought is necessary, not whether it is helpful," *United States v. Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001).   *See also United States v. Mahabub*, 2014 WL 4243657, at *2 (S.D.N.Y. Aug. 26, 2014) ("The purpose of a bill of particulars is to ensure that a defendant has the information necessary to prepare a defense, not to turn over all information that would aid the defendant."); *United States v. Rittweger*, 259 F. Supp. 2d 275, 292-93 (S.D.N.Y. 2003) (denying bill of particulars request as "an impermissible attempt to compel the Government to provide the evidentiary details of its case") (citation and quotation marks omitted).

A bill of particulars should not be misused to compel the Government to disclose "the manner in which it will attempt to prove the charges, the precise manner in which the defendant committed the crime charged, or a preview of the Government's evidence or legal theories." *Mitlof*, 165 F. Supp. 2d at 569; *see also Torres*, 901 F.2d at 234 ("'Acquisition of evidentiary detail is not the function of the bill of particulars.'" (quoting *Hemphill v. United States*, 392 F.2d 45, 49 (8th Cir. 1968))); *United States v. Gibson*, 175 F. Supp. 2d 532, 537 (S.D.N.Y. 2001) ("A bill of

particulars is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial.") (citations omitted); *United States v. Bellomo*, 263 F. Supp. 2d 561, 580 (E.D.N.Y. 2003) ("A bill of particulars is not designed to: obtain the government's evidence; restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret its evidence for the defendant, or disclose its legal theory."); *United States v. Henry*, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994) ("This instrument should not function to disclose evidence, witnesses, and legal theories to be offered by the Government at trial or as a general investigative tool for the defense.").

There are good reasons why bills of particulars are warranted only where the allegations in the Indictment, as supplemented by discovery and other materials, are so general as to render it impossible to prepare a defense. Because "a bill of particulars confines the Government's proof to particulars furnished," it can "restrict unduly the Government's ability to present its case." *Henry*, 861 F. Supp. at 1197; *see also Mahabub*, 2014 WL 4243657, at *2 (recognizing that "care must be taken" in deciding whether to order a bill of particulars because "[t]he government's presentation of evidence at trial is limited to the particulars contained in the bill"); *Samsonov*, 2009 WL 176721, at *3 ("The vehicle of a bill of particulars serves to inform a defendant of the nature of the charge, when he is otherwise insufficiently informed, and must not [] be misused to compel disclosure of how much the Government can prove, nor to foreclose the Government from using proof it may develop as the trial approaches."). Moreover, the Government's provision of particulars tantamount to an itemized preview of its proof creates the very real danger that a defendant will "tailor [his] testimony to explain away the Government's case." *Henry*, 861 F. Supp. at 1197. These concerns animate the rule that "if the defendant has been given adequate

notice of the charges against [him] and can prepare fully for trial with reasonably diligent efforts, the Government cannot be required to disclose additional details about its case."   *Id.*

**B. Discussion**

Applying these principles, the defendant is not entitled to, and should not be granted, a bill of particulars.  The charges in this case are straightforward, focused on a single defendant receiving inside information as a result of his role as a member of the Board of Directors of a single company, and illegally providing that inside information to his friends and a family member or otherwise causing them to purchase stock in advance of a single public announcement of a tender offer.  The Indictment, criminal Complaint, and discovery produced by the Government, including detailed allegations in search warrant affidavits, provide the defendant with highly detailed information about the nature of the charges and the evidence against him.

To begin, the Indictment itself alleges more than sufficient factual detail to defeat a claim for a bill of particulars.  The Indictment includes allegations about, among other things (1) the defendant's duties to, and receipt of inside information from, Auspex, where he held a position on the Board of Directors (Indict. ¶¶ 3, 9, 11), (2) the defendant's obtaining of inside information by virtue of his seat on the board of directors through board meetings and discussions with Auspex's CEO (*see, e.g.*, *id.* ¶¶ 3, 14-16, 19, 25, 34, 38, 39, 42), (3) the MNPI the defendant obtained after key events and meetings during which Teva's confidential interest in a potential acquisition of Auspex and Auspex's consideration of that potential acquisition, including its preparations for and analysis of the structure of the potential acquisition, were discussed (*see, e.g.*, *id.* ¶¶ 3, 14-16, 19, 25, 34, 38, 39, 42), (4) the defendant's timely communications with the Associates around key events and meetings related to the progression of Teva's potential acquisition of Auspex and Auspex's internal discussions and analysis regarding the potential acquisition, and the steps taken

by the Associates after those communications (*see, e.g., id.*, ¶¶ 17, 20, 22, 26, 27, 30, 32, 34, 37. 39-41, 43, 45-50), (5) particular securities trades that the Associates and remote tippees placed, including the volume of securities and the price, (*see, e.g., id.* ¶¶ 17, 24, 26, 29, 35, 37, 39-41, 43, 45-50), and (6) the aggregate profits resulting from those trades (*id.* ¶ 9). Thus, the Indictment itself provides a sufficient basis to deny the defendant's motion in its entirety. *See, e.g., United States v. Bonventre*, 646 F. App'x 73, 79 (2d Cir. 2016) ("[E]videntiary detail is not the function of the bill of particulars. . . . . Particulars are necessary only where indictment charges are so general that they do not advise the defendant of the specific acts of which he is accused.") (internal quotation marks omitted); *United States v. Ferrarini*, 9 F. Supp. 2d 284, 299 (S.D.N.Y. 1998) (denying bill of particulars where "indictment alone . . . discloses sufficient information to inform the defendants adequately of the charges against them").

Additional particularity relating to the detailed allegations in the Indictment might be helpful for the defendant, but that is both true in every case and not the appropriate standard. Instead, the inquiry is properly focused on whether the information already available to him is so general that a bill of particulars is *necessary* to the preparation of his defense. Plainly it is not. In addition to the speaking Indictment and a detailed criminal complaint, the defendant has received extensive discovery in this case, the vast majority of which the Government made available to the defense in April of this year, and which the Government has supplemented, including with several disclosures of *Brady* and potential *Brady* materials – including Jencks Act materials – related to testifying and non-testifying witnesses, much of which was provided out of an abundance of caution, now more than eight months before trial. The Government's discovery productions are electronically searchable, accompanied by itemized indices with Bates ranges, and available to the defense in the same format in which it is available to the Government. The

Government produced, among other things, lengthy and detailed search warrant affidavits laying out the chronology of the events at issue, particular examples of confidential Auspex information the defendant received and the timing of his receipt of that information, the precise timing of communications between the defendant and the Associates, and, where relevant, the communications between the Associates and remote tippees, and a detailed account of the relevant trading activity.

The Government also produced, among other things, emails containing inside information that the defendant received in advance of the tender offer announcement, phone records, the relevant contents of searched phones, iCloud accounts, and personal email accounts, and bank and brokerage records, including records reflecting the illegal trading alleged in the Indictment. This material is far more than sufficient to allow the defendant to prepare for trial. Indeed, it appears he has actively availed himself of the discovery to prepare motions in this case, and his legal team has demonstrated their adeptness at navigating the relevant discovery and identifying materials they deem relevant to the preparation of his defense, *see* Dkt. Nos. 39, 42 and 47 (defense declarations attaching dozens of exhibits derived from the discovery in this case). Considering the detail provided about the charges in the Indictment and the detailed information that Government has produced in discovery in this case, the discovery is a reason to *deny*, not grant, the defendant's motion. *See, e.g., United States v. Mandell*, 710 F. Supp. 2d 368, 385 (S.D.N.Y. 2010) (the "mere existence of a 'mountain of documents' does not entitle" a defendant to a bill of particulars). The defendant even has access to materials that the Government does not have access to and is already using those materials in preparation for his defense. For example, in connection with his motion to suppress evidence (Dkt. Nos. 43, 44, 45, 46, and 47), the defendant cites minutes from a March 11, 2015 meeting of the Audit Committee of the Auspex Board that

the Government did not previously have access to because they were attached to an email from counsel that had been segregated from emails reviewed by the prosecution team. *See* Gov't Opposition to the Defendant's Motion to Suppress Evidence, Dkt. No. 55 at 43 (filed under seal); Dkt. No. 47, Ex. 52. Furthermore, given the information the defendant already has from the discovery, the Indictment, and pretrial filings, any additional detail in the form of a restrictive bill of particulars would essentially serve as a production of the Government's order of proof and continued early access to Jencks Act materials, allowing the defendant to tailor any testimony to the Government's case more than eight months before trial.

The defendant nonetheless seeks a bill of particulars specifying information about the MNPI he communicated to the four Associates in the Indictment, when and how he became aware of the MNPI he shared, when and how he communicated the MNPI to his tippees, and for which of the trades based on MNPI will he be held liable. Dkt. No. 41 at 23. But the defendant ignores that the Government has produced to the defendant emails, phone records, and other materials surrounding the Board and Auspex senior management meetings and discussions about the potential acquisition, phone records reflecting communications between the defendant and the Associates, and the Associates' trading records. These materials adequately address the defendant's demand for particulars about the nature and timing of the defendant's receipt and disclosure of inside information. Moreover, and as described above, the discovery includes multiple search warrant affidavits that narrate the Government's proof. The defendant therefore has all that he needs – and more – to understand the Government's allegations and to prepare a defense.

The cases upon which the defendant relies are unavailing. *United States v. Rajaratnam*, was a far more complex insider trading case than this one, and involved multiple insider trading

conspiracies, multiple alleged conspirators and communications, large numbers of companies and transactions, and extend periods of time. 719 F.3d 139 (2d Cir. 2013). Here, the defendant is the sole insider charged with a scheme in which he passed MNPI regarding Auspex's potential acquisition by Teva to his family and friends so that they could make profitable securities trades based upon that MNPI, and otherwise caused them to purchase securities based on that MNPI. The core allegations relate to the defendant's conduct from January 2015 through March 2015 – a three-month time period. This case can hardly be viewed as especially complex, particularly when compared to the allegations in *Rajaratnam*, and courts in this District have routinely denied motions for a bill of particulars in insider trading cases, including requests for more specificity regarding the MNPI that was passed, when the Indictment clearly describes – as it does here – the overall nature of the information at issue. *See, e.g. United States v. Blakstad*, No. 19 CR. 486 (ER), 2020 WL 5992347, at *11 (S.D.N.Y. Oct. 9, 2020) (denying motion for bill of particulars in insider trading case involving "one inside tipster, one company, and four earnings releases that spurred allegedly unlawful transactions" where "additional information beyond that provided in discovery and the indictments [was] not necessary for [the defendant's] defense."); *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 302 (S.D.N.Y. 2018) (denying motion for bill of particulars in insider trading case involving "one specific stock based on material nonpublic information exchanged during a specific period of time between" the defendant and his co-defendants where "the Indictment clearly describes the overall nature of the information here in issue, at what time and in what capacity [the defendant] acquired this information, [the defendant's] subsequent contact with [a co-defendant], and [the co-defendant's] trades thereafter."); *United States v. William Walters*, *a/k/a "Billy,"* No. 16 Cr. 338 (PKC) (Dkt. No. 51 at 27) (similarly rejecting the defendant's request for granular particularity regarding the specifics of the MNPI passed in a case

involving six years of repeated tips); *United States v. Stewart*, No. 15 Cr. 287 (S.D.N.Y. Jan. 19, 2016) (Dkt. No. 64, at 21) (denying request for bill of particulars in insider trading case, and rejecting comparison to *Rajaratnam*, reasoning that "specificity as to the substance of tipping communications may sometimes be necessary in complex insider trading cases involving multiple alleged conspirators and communications, large numbers of companies and transactions and extended time periods . . . [but] no such challenge of complexity is presented here.).

This case, which involves trading on inside information from a single source in a single ticker in advance of a single public announcement of a tender offer over the course of approximately three months is much more like *Blakstad*, *Pinto-Thomaz*, *Walters*, and *Stewart* than *Rajaratnam*, which involved multiple charged conspiracies, multiple companies and transactions, and extended periods of time.[5]

Indeed, the defendant's factual summary of the allegations and his point-by-point rebuttal to each of them, *see* Dkt. No. 41 at 12-18, is an implicit concession that the Indictment is detailed and specific enough on the dates of relevant events and communications to apprise the defendant of the charges against him and to allow him to prepare his defenses.

The defendant's dim view of the strength of the allegations set forth in the Indictment, and the preview of potential defense theories that he provides, is not a basis for him to misuse a bill of particulars to compel the Government to disclose "the manner in which it will attempt to prove the

---

[5] The other cases upon which the defendant relies were substantially more complex than this one, and, as such, easily distinguishable. *See, e.g.*, *United States v. Contorinis*, 9 Cr. 1083 (RJS), Dkt. No. 49 (ordering Government to provide particulars about which of the defendant's 160 trades in the relevant time period were alleged to be the product of inside information in light of the fact that the Government was alleging that only an unidentified subset of those trades resulted from insider tips); *United States v. Nacchio*, 2006 WL 2475282 (D. Colo. Aug. 25, 2006) (granting bill of particulars where indictment contained 42 counts and indictment did not allege how inside information tied to those counts).

charges, the precise manner in which the defendant committed the crime charged, or a preview of the Government's evidence or legal theories." *Mitlof*, 165 F. Supp. 2d at 569. For example, in preparing his defense, the defendant purposefully takes too myopic a view of what may constitute MNPI in a criminal insider trading case, citing inapposite civil cases for general pronouncements regarding the materiality of "preliminary, contingent, and speculative" acquisition discussions. *See* Dkt. No. 41 at 23 (citing inapposite civil cases for what constitutes MNPI as a matter of applicable legal principles in those cases). The Second Circuit has long held that "[i]nformation is material when there is a substantial likelihood that a reasonable investor would find it important in making an investment decision." *United States v. Contorinis*, 692 F.3d 136, 143 (2d Cir. 2012) (*citing United States v. Cusimano*, 123 F.3d 83, 88 (2d Cir. 1997)). "To be material, information must 'alter[ ] the "total mix" of information available.'" *Id.* For example, in the context of potential transactions, "a tip that provides additional reliability to existing information about the status of a transaction based on the source's access to inside information may be material because it lessens the risk from uncertainty." *United States v. Contorinis*, 692 F.3d 136, 143–44 (2d Cir. 2012). Confirmation by an insider of unconfirmed facts or rumors – even if reported in a newspaper or research report – may itself be inside information. A tip from an insider that is more reliable and specific than unconfirmed facts or public rumors is non-public information despite the existence of such rumors in the media or investment community. *Id.*

Thus, consistent with controlling case law and the allegations in the Indictment, the provision of confidential information by a sitting member of a public company's board of directors regarding the progress of a potential acquisition, including (i) about the steps taken by the company to prepare itself for acquisition (including which investment bank's services it had procured), (ii) about the engagement of an audit team to analyze the structure of the potential acquisition), and

26

(iii) his opinion (as a sitting member of the board) that "it" (an acquisition) "can happen," all constituted MNPI.   This information is sufficiently detailed in the Indictment, criminal complaint, and discovery produced by the Government.

For the reasons set forth above, the Court should deny the defendant's motion for a bill of particulars.

## III.   There Is No Basis to Strike Any Portion of the Indictment

The defendant moves to strike (1) the allegations that he lied to FINRA about his contacts with certain individuals in the weeks leading up to the Teva acquisition announcement, Indict. ¶¶ 10, 24, 42, and 51-57, (2) what the defendant characterizes as "implied allegations," "generalizations," or "speculation," Indict. ¶¶ 26, 30-32, 42-45, and (3) language such as "among other things," "included," and "including," Indict. ¶¶ 9, 10, 21, 22, and 24.[6]   The motion is baseless.   *First*, the allegations regarding the defendant's lies to FINRA and what the defendant characterizes as "implied allegations," "generalizations," or "speculation" all pertain to evidence that will be relevant and admissible at trial and are no more inflammatory or prejudicial than the insider trading and tender offer fraud charges in the Indictment.   *Second*, language such as "among other things," "included," and "including," which is used sparingly in the Indictment, appropriately summarizes and sets forth the relevant circumstances, means, and methods by which the defendant carried out his crimes, or otherwise describe evidence that is otherwise admissible

---

[6] The defendant's motion presumes that the Court will provide a copy of the Indictment to the jury when it commences its deliberations.   If that is not the Court's practice, then the jury will not see the Indictment and his motion to strike certain language from it would be moot.   The Government's opposition to the defendant's motion presumes that whether the Court will provide the jury with a copy of the Indictment is under consideration at least, in part, because trial is more than eight months away.

at trial, and should not be stricken. Accordingly, the defendant's motion to strike should be denied.

### A. Applicable Law

"Although the Federal Rules of Criminal Procedure grant the Court authority to strike surplusage from an indictment, *see* Fed. R. Crim. P. 7(d), '[i]t has long been the policy of courts within the Southern District to refrain from tampering with indictments.'" *United States v. Bin Laden*, 91 F. Supp. 2d 600, 621 (S.D.N.Y. 2000) (quoting *United States v. Jimenez*, 824 F. Supp. 351, 369 (S.D.N.Y. 1993)). "Motions to strike surplusage from an indictment will be granted only where the challenged allegations are 'not relevant to the crime charged and are inflammatory and prejudicial.'" *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990) (quoting *United States v. Napolitano*, 552 F. Supp. 465, 480 (S.D.N.Y. 1982)). "'[I]f evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken.'" *Id.* (brackets in original) (quoting *United States v. DePalma*, 461 F. Supp. 778, 797 (S.D.N.Y. 1978)); *see also United States v. Mulder*, 273 F.3d 91, 99 (2d Cir. 2001). "This standard is an exacting one, and only rarely is alleged surplusage stricken from an indictment." *United States v. Murgio*, 209 F. Supp. 3d 698, 724 (S.D.N.Y. 2016) (citations and internal quotation marks omitted).

In setting forth allegations in an indictment, the Government is not limited to a description of only the bare elements of a crime; rather, an indictment may be used to provide background to the charged criminal conduct, to describe the circumstances, means, and methods of an offense, and to describe evidence that is otherwise admissible at trial. Simply put, "[s]tatements providing background are relevant and need not be struck." *United States v. Mostafa*, 965 F. Supp. 2d 451, 466 (S.D.N.Y. 2013) (citing *Mulder*, 273 F.3d at 100). Allegations also will not be stricken where

they elucidate the circumstances, means, and methods of a charged scheme or would be admissible, in the alternative, under Rule 404(b) of the Federal Rules of Evidence. *See United States v. Hernandez*, 85 F.3d 1023, 1030 (2d Cir. 1996) (affirming denial of motion to strike surplusage where "[d]efendants' cocaine-related activity was clearly relevant evidence of the organizational structure and method of operation of their heroin conspiracy, and it also tended to establish the nature of the relationship between Defendants and their supplier of heroin, defendant Jose Antonio Hernandez," and citing Rule 404(b)).

In terms of timing, "[c]ourts in this district routinely await presentation of the Government's evidence at trial before ruling on a motion to strike." *Mostafa*, 965 F. Supp. 2d at 467 (citing, *inter alia*, *Scarpa*, 913 F.2d at 1012); *see also United States v. Ahmed*, No. 10 Cr. 131 (PKC), 2011 WL 5041456, at *3 (S.D.N.Y. Oct. 21, 2011). As multiple courts have concluded, "'[t]here is little or no purpose in attempting to predict in advance of trial what evidence will prove admissible or how specific allegations relate to the overall charges.'" *United States v. Smith*, 985 F. Supp. 2d 547, 612 (S.D.N.Y. 2014), *aff'd sub nom. United States v. Halloran*, 664 F. App'x 23 (2d Cir. 2016) (quoting *United States v. Butler*, 351 F. Supp. 121, 124 (S.D.N.Y. 2004)).

**B. Discussion**

The defendant's motion to strike should be denied – or at a minimum deferred until after the conclusion of the Government's direct case – because all of the challenged allegations pertain to evidence that will be relevant and admissible at trial and are not unduly prejudicial. The defendant takes umbrage at (1) the allegations that he lied to FINRA about his contacts with certain individuals in the weeks leading up to the Teva acquisition announcement, Indict. ¶¶ 10, 24, 42, and 51-57, (2) what the defendant characterizes as "implied allegations," "generalizations," or

"speculation," Indict. ¶¶ 26, 30-32, 42-45, and (3) language such as "among other things," "including," and "including," Indict. ¶¶ 9, 10, 21, 22, and 24.   Each category is addressed below.

*First*, the allegations regarding the defendant's lies to FINRA are properly included in the Indictment's description of how the defendant attempted to conceal his crimes, which is admissible as direct evidence of his crimes or, in the alternative, pursuant to Rule 404(b) to prove the defendant's motive, intent, and knowledge, and highly probative of the defendant's consciousness of guilt.[7]   While the defendant may disagree with the Government's assertion that telling FINRA he "did not recall" having contact with Associate-1 and Associate-3 – all individuals with whom the defendant had extensive communications during the time period that was the focus of the FINRA investigation – constituted a series of lies, that is an argument to be made to the jury after all of the evidence is in, and not a reason to strike language from the Indictment regarding relevant and admissible evidence that has been voted on and returned by a duly empaneled grand jury.

---

[7] Direct evidence is "not confined to that which directly establishes an element of the crime." *United States v. Gonzalez*, 110 F.3d 941, 942 (2d Cir. 1997).   Rather, "[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." *Id.*   Under Rule 404(b) of the Federal Rules of Evidence, evidence of uncharged crimes, wrongs, or other acts by a defendant may be admitted for purposes other than proving the defendant's propensity to commit crimes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b).   The Second Circuit has long followed "an inclusionary approach to evaluating Rule 404(b) evidence, which allows evidence to be received at trial for any purpose other than to attempt to demonstrate the defendant's criminal propensity." *United States v. Edwards*, 342 F.3d 168, 176 (2d Cir. 2003) (internal quotation marks and citation omitted).   Under Rule 404(b), it is well settled that "other acts" evidence is admissible so long as the evidence: (1) is advanced for a proper purpose; (2) is relevant to the crimes for which the defendant is on trial; and (3) has probative value that is not substantially outweighed by any unfair prejudicial effect. *See United States v. Paulino*, 445 F.3d 211, 221 (2d Cir. 2006); *United States v. LaFlam*, 369 F.3d 153, 156 (2d Cir. 2004).   If requested, the admission of such evidence must be accompanied by an appropriate limiting instruction to the jury. *See United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993).   "[O]ther acts" evidence can constitute direct evidence and, in that case, is not subject to analysis under Rule 404(b). *See, e.g., United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000).

*Second*, what the defendant characterizes as "implied allegations," "generalizations," or "speculation," all constitute relevant background to the charged conduct, describe relevant circumstances, means, and methods of his offenses, or otherwise describe evidence that is otherwise admissible at trial. For example, allegations that the defendant called Associate-3 on the same day that Auspex signed a confidentiality agreement with a potential suitor different than Teva, Indict. ¶ 42, after which, at the earliest possible moment he could, Associate-3 began purchasing substantial quantities of Auspex stock, *id.* ¶ 43, are relevant to demonstrate the defendant's pattern of communicating with the Associates at key dates and times during Auspex's assessment of a potential transaction and causing them to purchase Auspex stock and are no more inflammatory or upsetting the charges themselves. The same is true for the allegations about the defendant's tips to Associate-1, *id.* ¶ 26, Associate-2, *id.* ¶¶ 30-32, and Associate-4, *id.* ¶¶ 44, 45. These paragraphs contain factual assertions demonstrating how and when the defendant provided Associate-1, Associate-2 and Associate-4 with MNPI, and what they did after receiving that MNPI, which are all directly relevant to the charged crimes. To the extent the defendant's central complaint is that some of this evidence is circumstantial, it is axiomatic that circumstantial evidence is as valuable as direct evidence, and the law makes no distinction between direct and circumstantial evidence, if relied upon by a jury. *United States v. Casamento,* 887 F.2d 1141, 1156 (2d Cir.1989) ("Circumstantial evidence, it should be noted, if relied upon by the jury, is of no lesser probative value than direct evidence."), *cert. denied,* 493 U.S. 1081 (1990)). At trial, the Government will offer admissible evidence supporting the factual allegations set forth in these paragraphs and ask the jury to draw the permissible inference that these facts – combined with others – demonstrate that the defendant passed MNPI to his friends and a family member so that they could make profitable trades based on that MNPI, or otherwise caused them to purchase

31

securities based on that MNPI. That the defendant disputes his guilt and will ask the jury to draw a different inference from or disregard facts such as those set forth in paragraphs 26, 30-32, and 42-45 does not render them irrelevant, inflammatory, or prejudicial, and does not require that they be stricken from the Indictment.

*Third*, the language that the defendant finds offensive in paragraphs 9, 10, 21, 22, and 24 appropriately summarize and set forth the relevant circumstances, means, and methods by which the defendant carried out his crimes, or otherwise describe evidence that is admissible at trial, and should not be stricken. Courts in this district have held that so-called "broadening" language in sections of a paragraph alleging the means and methods by which the defendant committed the charged offense do not impermissibly broaden the charge but instead go to the proof the Government would offer to sustain it and, thus, are permissible. *See United States v. Kassir*, No. S2 04 CR. 356 (JFK), 2009 WL 995139, at *3 (S.D.N.Y. Apr. 9, 2009) (collecting cases). In *Kassir*, the court denied the defendant's motion to strike "broadening" language in *means* paragraphs of the indictment, which was deemed permissible, as distinguished from "broadening" language in *charging* paragraphs, which may be impermissible under certain circumstances, and recognized that "[t]he Second Circuit has noted in dicta that this distinction is not without force." *Id.* (citations and internal quotation marks omitted). The *Kassir* court also observed that the same judge who decided *United States v. Pope*, 189 F. Supp. 12 (S.D.N.Y. 1960) – a case relied on heavily by the defendant – later *rejected* a challenge to similar language in *United States v. Mayo*, 230 F. Supp. 85 (S.D.N.Y. 1964), when the challenged language related to the means and methods by which the defendant committed the charged offense. *Id.* ("The problem identified in Pope only arises, however, if the broadening language appears in a charging paragraph."). *Kassir* and *Mayo* are not alone in drawing this distinction. *See, e.g.*, *United States v. Booth*, No. 99 CR. 378 LBS,

1999 WL 1192317, at *11 (S.D.N.Y. Dec. 14, 1999) (cited in *Kassir*) ("[W]hen a means paragraph, which refers to the matter of proof to sustain the charges, contains surplusage, a court should not strike the language.") (citations omitted); *United States v. Washington*, 947 F.Supp. 87, 90 (S.D.N.Y. 1996) (cited in *Kassir*) (same); *United States v. Chovanec*, 467 F.Supp. 41, 46 (S.D.N.Y. 1979) (cited in *Kassir*) ("It has been held that where as in the present case a phrase such as 'among the means' appears in the 'means' paragraph of the indictment, [*i.*]*e.*, a paragraph that does not charge the gravamen of the offense, the phrase need not be stricken."); *United States v. DePalma*, 461 F.Supp. 778, 798–99 (S.D.N.Y. 1978) (cited in *Kassir*).[8]

Paragraphs 9 and 10 of the Indictment appear directly below a heading stating, "Overview of the Insider Trading Scheme" and, as such, are "overview" paragraphs that use "including" and "among other things" to summarize the allegations about the means and methods by which the defendant carried out his crimes in the paragraphs that follow. *See* Indict. ¶¶ 9 (using "including" to summarize family and friends the defendant tipped), 10 (using "among other things" to summarize the defendant's false statements to FINRA). The Indictment's use of "included" or "among other things" in paragraphs 21, 22, and 24 serves the same purpose – the language conveys

---

[8] The defendant cites *United States v. Mango*, in which the court struck broadening language that would "allow the jury to draw the inference that defendants are accused of crimes not charged in the indictment." No. 96-CR-327, 1997 WL 222367, at *16 (N.D.N.Y. May 1, 1997). *Mango*, too, recognized a distinction between broadening language in charging paragraphs and means paragraphs, but, contrary the weight of authority in this District, held that the challenged paragraphs could be characterized as charging paragraphs because they were "included by reference in all of the counts of the Indictment and set forth the basis for the offenses charged." *Id.* Here, although paragraphs in the Indictment containing the "broadening" language are incorporated by reference in the charging paragraphs, as is customary in this District, they concentrate on the means by which the defendant carried out the charged offenses and, even applying the reasoning in *Mango*, do not charge the gravamen of the offenses. *Chovanec*, 467 F. Supp. at 46 (S.D.N.Y. 1979) (cited in *Kassir*) ("where a phrase such as 'among the means' appears in the 'means' paragraph of the indictment, [*i.*]*e.*, a paragraph that does not charge the gravamen of the offense, the phrase need not be stricken.").

that the information that follows is a summary of, but does not set forth all, facts and evidence related to the relevant circumstances, means and methods by which the defendant carried out the scheme. *See* Indict. ¶ 21 (summarizing confidential information the defendant provided Associate-1, highlighting particular information by using the word "including"), 22 (describing how, after receiving confidential information from the defendant, Associate-1 called the CW, and highlighting a particular call that lasted approximately five minutes by using the word "including"); 24 (describing how the defendant "continued to engage in substantial communications with Associate-1" following the March 11, 2015 phone call in which he (the defendant) had conveyed confidential information to Associate-1, and highlighting a particular example with the use of "[a]mong other things"). In short, all of the "broadening" language about which the defendant complains permissibly describes the means and methods by which the defendant carried out his crimes, and in no way expands or enlarges the charges returned by the grand jury. Accordingly, the Court should not strike this language.

*Finally*, the Government presumes that the Court will, as is customary in this District, provide the standard instruction to the jury that the Indictment merely contains charges or accusations, is not evidence, and does not prove or even indicate guilt and, therefore, the jury is to give it no weight in deciding the defendant's guilt or lack of guilt. Because juries are presumed to follow their instructions, *Zafiro v. United States*, 506 U.S. 534, 540 (1993), such an instruction will serve to minimize any risk of potential prejudice that the defendant argues may occur from the language he seeks to strike but which, as described above, is permitted by controlling case law.

## CONCLUSION

For the foregoing reasons, the Court should deny the defendant's pretrial motions.

Dated: New York, New York
August 13, 2021

Respectfully submitted,

AUDREY STRAUSS
Unite States Attorney

By: _____/s/_____
Negar Tekeei / Daniel Tracer
Assistant United States Attorneys
Tel. (212) 637-2482 / 2329