UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x
                                         :

UNITED STATES OF AMERICA          :

                                         :

                   -against-          :         Case No. 1:21-cr-202-GHW

                                         :

SEPEHR SARSHAR,               :

                                         :

                                 Defendant. :

-----------------------------------------------------------x

## REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT SEPEHR SARSHAR'S MOTION TO DISMISS THE INDICTMENT, COMPEL THE PRODUCTION OF A BILL OF PARTICULARS, AND STRIKE SURPLUSAGE

GIBSON, DUNN & CRUTCHER LLP
AVI WEITZMAN
REED BRODSKY
200 Park Avenue
New York, NY 10166
Telephone: 212.351.4000
Facsimile: 212.351.4035

*Counsel for Defendant Sepehr Sarshar*

# TABLE OF CONTENTS

Page

**PRELIMINARY STATEMENT** ...............................................................................1

**I.     ARGUMENT**...............................................................................................3

    A.     Counts I and II of the Indictment Are Duplicitous and Should be
         Dismissed................................................................................................3

    B.     The Court Should Order the Government to Produce a Bill of
         Particulars. ...........................................................................................11

    C.     The Court Should Grant the Motion to Strike. ..................................19

**II.    CONCLUSION** .........................................................................................**24**

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Basic Inc. v. Levinson*,
    485 U.S. 978 (1988)..................................................................................................16

*Berkovich v. Hicks*,
    922 F.2d 1018 (2d Cir. 1990)..................................................................................22

*In re Columbia Pipeline, Inc.*,
    405 F. Supp. 3d 494 (S.D.N.Y. 2019).....................................................................20

*Ramos v. Louisiana*,
    140 S. Ct. 1390 (2020)...............................................................................................9

*Stephen v. Hanley*,
    2009 WL 1471180 (E.D.N.Y. May 21, 2009) .......................................................22

*United States v. Bentley*,
    2006 WL 2193453 (D. Ore. July 31, 2006) ...........................................................15

*United States v. Blakstad*,
    2020 WL 5992347 (S.D.N.Y. Oct. 9, 2020) ..........................................................16

*United States v. Bortnovsky*,
    820 F.2d 572 (2d Cir. 1987).....................................................................................11

*United States v. Contorinis*,
    No. 09-cr-1083-RJS (S.D.N.Y.)........................................................................11, 12

*United States v. DeFabritus*,
    605 F. Supp. 1538 (S.D.N.Y. 1985)........................................................................23

*United States v. DePalma*,
    461 F. Supp. 778 (S.D.N.Y. 1978)....................................................................23, 24

*United States v. Di Stefano*,
    555 F.2d 1094 (2d Cir. 1977)...................................................................................19

*United States v. Edwards*,
    473 F. App'x 429 (6th Cir. 2012) ............................................................................19

*United States v. Gabriel*,
    920 F. Supp. 498 (S.D.N.Y. 1996)............................................................................8

Page(s)

*United States v. Garcia,*
    291 F.3d 127 (2d Cir. 2002) ........................................................................... 22

*United States v. Hernandez,*
    980 F.2d 868 (2d Cir. 1992) ........................................................................... 15

*United States v. Hinton,*
    127 F. Supp. 2d 548 (D.N.J. 2000) ............................................................... 6, 9

*United States v. Kassir,*
    2009 WL 995139 (S.D.N.Y. Apr. 9, 2009) ..................................................... 22

*United States v. Kearney,*
    451 F. Supp. 33 (S.D.N.Y. 1978) ..................................................................... 6

*United States v. Mango,*
    1997 WL 222367 (N.D.N.Y. May 1, 1997) ................................................. 22, 3

*United States v. Margiotta,*
    646 F.2d 729 (2d Cir. 1981) ............................................................................. 8

*United States v. Martoma,*
    2013 WL 2435082 (S.D.N.Y. June 5, 2013) ................................................. 11

*United States v. Moloney,*
    287 F.3d 236 (2d Cir. 2002) ......................................................................... 6, 7

*United States v. Mulder,*
    273 F.3d 91 (2d Cir. 2001) ......................................................................... 21, 24

*United States v. Munoz-Franco,*
    986 F. Supp. 70 (D.P.R. 1997) ................................................................. 4, 7, 8

*United States v. Nacchio,*
    2006 WL 2475282 (D. Colo. Aug. 25, 2006) ............................................. 12, 13

*United States v. Nacchio,*
    608 F. Supp. 2d 1237 (D. Colo. 2009) ........................................................... 16

*United States v. Nealy,*
    2016 WL 3660266 (A. Ct. Crim. App. June 30, 2016), *aff'd* (C.A.A.F. May 4, 2017) .......... 19

*United States v. Olmeda,*
    461 F.3d 271 (2d Cir. 2006) ........................................................................... 10

Page(s)

*United States v. Perrone,*
  936 F.2d 1403 (2d Cir. 1991)................................................................19

*United States v. Pinto-Thomaz,*
  352 F. Supp. 3d 287 (S.D.N.Y. 2018)....................................................17

*United States v. Pope,*
  189 F. Supp. 12 (S.D.N.Y. 1960)...........................................................23

*United States v. Rajaratnam,*
  2010 WL 2788168 (S.D.N.Y. July 13, 2010) ............................11, 12, 13

*United States v. Stewart,*
  No. 15-cr-287-JSR (S.D.N.Y.)...............................................................18

*United States v. Walters,*
  No. 16-cr-338-PKC (S.D.N.Y.) .......................................................17, 18

*United States v. Washington,*
  947 F. Supp. 87 (S.D.N.Y. 1996)...........................................................23

*United States v. Wey,*
  2017 WL 237651 (S.D.N.Y. Jan. 18, 2017) .............................................7

**RULES**

Fed. R. Crim. P. 7 .......................................................................................11

Fed. R. Crim. P. 7(d)...................................................................................24

Fed. R. Crim. P. 7(f) ...................................................................................11

## PRELIMINARY STATEMENT

The government's opposition brief confirms that the charges against Defendant Sepehr Sarshar ("Dr. Sarshar") are based on vague and prejudicial allegations with gaping holes that demonstrate Dr. Sarshar's innocence. The government accuses Dr. Sarshar of passing material non-public information ("MNPI") about Auspex Pharmaceuticals, Inc. ("Auspex"), the company he founded in 2005, to a number of friends and family members. The government makes these accusations (1) without offering any detail about what inside information Dr. Sarshar is alleged to have received or passed or when he received some of the inside information; (2) without providing any probative or admissible evidence of the substance of any of his communications with alleged tippees; and (3) without acknowledging the key fact that several of the alleged tippees' trading activity is inconsistent with allegations of insider trading, including that multiple traders sold shares of Auspex at critical times after they allegedly received information from Dr. Sarshar. The reality is that Dr. Sarshar never traded on inside information, never tipped inside information to anyone, did not receive any money or other benefits from the alleged tippees' trading in Auspex, and in the first quarter of 2015, was not privy to many of the transaction details that the government seemingly alleges he provided to friends and family.

Indeed, by 2009, Dr. Sarshar relinquished his management role at Auspex to focus on other pursuits, and from that point forward, his only involvement was as an investor and member of the company's board. He did not manage or have visibility into the company's day-to-day affairs and he did not take part in Auspex management's deal negotiations that culminated with Teva's tender offer in 1Q2015. Because its charges are so weak, the government attempts to create artificial support for its claims by framing and wording the Indictment in a manner that is improper and highly prejudicial to Dr. Sarshar.

*First*, the government attempts to charge Dr. Sarshar with a single scheme to commit securities fraud and tender offer fraud in order to obfuscate the holes in the government's case. This was not a single, continuous scheme, as the government claims. To the extent the MNPI alleged in the Indictment is decipherable, it appears that the government's theory is that Dr. Sarshar provided each of the four Associates with different information, on different days, via different means. And there is no consistent trading pattern either, as some Associates were net sellers after allegedly receiving MNPI—a fact entirely inconsistent with the government's charges. Moreover, none of the Associates are alleged to have had any communication with the other Associates during the relevant time period or any knowledge of the other Associates' trading activities. Contrary to the government's claims, there is no connective tissue linking the multiple schemes. And by improperly charging Dr. Sarshar in a single scheme, the government has exposed Dr. Sarshar to great prejudice at trial and beyond.

*Second*, the government's allegations in the Indictment lack sufficient specificity and a bill of particulars is required. Most critically, the Indictment does not identify the inside information that Dr. Sarshar is alleged to have conveyed to the Associates, nor does it identify which remote trades it alleges Dr. Sarshar should be held responsible for. Dr. Sarshar cannot defend himself if he does not know what he is being accused of. By way of example, without knowing what information he is alleged to have provided to each Associate and when he is alleged to have received or provided it, Dr. Sarshar cannot defend himself by showing that the information was in fact public or non-material at that time. It is no answer for the government to tell the defense to find it in discovery—a veritable needle in a haystack—both because Dr. Sarshar's legal team has searched and could not find it, and because the discovery the government produced here is comprised of more than 700,000 documents, unindexed and often

commingled with other, unrelated documents. The government must produce a bill of particulars to allow Dr. Sarshar to defend himself in this action.

*Finally*, the Indictment is littered with vague and prejudicial surplusage that must be struck. Throughout the Indictment, the government repeatedly uses equivocal, broadening language such as "among other things" and "including" to describe its allegations against Dr. Sarshar—language that creates a moving target of allegations that Dr. Sarshar cannot defend against. The Indictment also prejudices Dr. Sarshar by repeatedly, and incorrectly, stating that he lied to FINRA. As the government well knows, Dr. Sarshar's statements that he "could not recall" interacting with any of the Associates during the designated time period were made within 90 minutes of receiving FINRA's request, without having an opportunity to consult with counsel, and while on vacation with limited internet access. Dr. Sarshar's response was prompt, forthright, and accurate to the best of his ability—a far cry from the incriminating "lie" the government alleges. The government's misstatements and improperly broad accusations should be stricken from the Indictment.

For the reasons stated in Dr. Sarshar's opening motion, and for the additional reasons stated herein, the Court should: (i) dismiss the Indictment because it is duplicitous or, at a minimum, require that a special verdict form be used; (ii) compel the production of a bill of particulars; and (iii) strike prejudicial surplusage from the Indictment under Rule 7(d) of the Federal Rules of Criminal Procedure. Because of the importance of these issues, Dr. Sarshar respectfully reiterates his request for oral argument.

## I.     ARGUMENT

### A.     Counts I and II of the Indictment Are Duplicitous and Should Be Dismissed.

In its opposition brief, the government concedes that it could have charged Dr. Sarshar in separate counts based on the trading in Auspex stock by his friends and family members but

chose not to. Opp. at 9 ("regardless of whether the Government *could* break down the activity into distinct crimes"). The government defends its decision by repeatedly asserting that Dr. Sarhar's acts were part of a single continuing scheme. However, the government's definition of the alleged scheme is superficial and overbroad and at odds with the allegations in the Indictment. In fact, the government's decision to charge single counts of securities fraud and tender offer fraud are designed to conceal gaping holes in the evidence where each individual Associate is concerned. Significantly, the government's improper charging decision exposes Dr. Sarshar to extreme prejudice, including nothing less than an unjust conviction. In these circumstances, the governing case law requires that the Indictment be dismissed as duplicitous or, at a minimum, that a special verdict form breaking out each individual alleged scheme be required.

The government contends that the Indictment involves only a single criminal scheme because it involved "a single victim," breach of "a single duty, the provision of MNPI about a single topic," and benefits to "a single group of people, his friends and family." Opp. at 9. This is a facile and overbroad characterization of the charges. Any reasonable reading of the Indictment shows that the government alleges four *separate* schemes, centered around four *separate* individuals, none of whom are alleged to have interacted, and all of whom are alleged (to the extent the Indictment can be deciphered) to have received *different* pieces of MNPI, at *different* times, via *different* methods.

Indeed, nothing ties together the four trading schemes described in the Indictment except that Dr. Sarshar is the alleged tipper and that the alleged MNPI broadly relates to a potential transaction involving Auspex. *See* Mot. at 12-22. That is clear from the structure of the Indictment, which is neatly divided into distinct sets of acts and actors comprising the four

4

alleged schemes. *See United States v. Munoz-Franco*, 986 F. Supp. 70, 71 (D.P.R. 1997)

(dismissing two counts of indictment as duplicitous where charges were "neatly divided" into

"distinct sets" of actors and actions).  Each of the distinctly outlined schemes involves different

individuals, none of whom is alleged to have communicated with the individuals in the other

referenced schemes during the relevant period.  Thus, each scheme involves disparate actors,

operating independently of each other, at different moments in time.  *Id.* at 71-72 (dismissing

counts as duplicitous where "[t]he participants in the [schemes] are different," the transactions of

one "scheme are totally unconnected" to the transactions of the other scheme, and where there

has been no "crossing of lines of a participant from one [scheme] to the other").  In addition,

each of the Associates is alleged to have received different tips, on different dates and times, and

to have engaged in individual, non-coordinated trading.  Each of the schemes is also alleged to

involve at least one unique tip that was provided on a different day and related to a different

event than any of the tips allegedly provided to the traders in the other schemes.  For example:

(1) **Scheme 1** (involving Associate-1 and the CW) (Indict. ¶¶ 14-29).  This is the only alleged scheme where the government alleges that Dr. Sarshar conveyed MNPI following a March 17 board meeting ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮  No other Associate is alleged to have received information about that March 17 board meeting or ▮▮▮▮▮▮▮ on that day or any subsequent day.

(2) **Scheme 2** (involving Associate-2 and her co-worker) (Indict. ¶¶ 30-41).  The government seems to allege that Dr. Sarshar conveyed information to Associate-2 that Dr. Sarshar obtained from separate February 25, 2015 and March 25, 2015 calls with the Auspex CEO.  Indict. ¶¶ 34, 39.  No other Associate is alleged to have received information about either of these calls or to have even talked with Dr. Sarshar in the days surrounding either call.[1]

(3) **Scheme 3** (involving Associate-3) (Indict. ¶¶ 42-43).  While extremely vague, the government's allegation appears to be that Associate-3 was tipped about a

---

[1]  The March 25, 2015 call is referenced in the allegations against Associate-4, but there is no allegation that Dr. Sarshar communicated with Associate-4 at any point between the call and the announcement of the tender offer.  Indict. ¶¶ 49-50.

confidentiality agreement between Auspex and a company other than Teva. Indict. ¶ 42. None of the other schemes concern that confidentiality agreement.

(4) **Scheme 4** (involving Associate-4 and his domestic partner) (Indict. ¶¶ 44-50). The Indictment alleges that Dr. Sarshar spoke with Associate-4 on February 10 after meetings between Teva and Auspex in Israel, Indict. ¶¶ 45, 48, but there is no similar allegation of tips involving the February meeting in Israel in any of the other alleged schemes.[2]

Hoping to save its Indictment, the government distorts the law and Dr. Sarshar's arguments. For example, the government devotes multiple pages to a discussion of *United States v. Kearney*, 451 F. Supp. 33 (S.D.N.Y. 1978). *See* Opp. at 10-12. While the government is correct that the obstruction of correspondence statute charged in *Kearney* does not concern a scheme, but rather prohibited individual transactions, that is a distinction without a difference in this case. Certainly, the fact that a statute charges a scheme cannot give the government *carte blanche* to categorize four separate schemes as one. Indeed, by the government's logic, it could use a single scheme statute to charge multiple schemes as a single scheme so long as a single defendant served as the hub of the scheme.[3] Courts have rejected such a misreading of the duplicity doctrine. *United States v. Hinton*, 127 F. Supp. 2d 548, 556 (D.N.J. 2000) (finding

---

[2] As the government is aware, Dr. Sarshar did not attend the February meetings in Israel and there is no allegation that he received any information about the meeting before he called Associate-4 on February 10. Indict. ¶ 45.

[3] The government cites *United States v. Moloney*, 287 F.3d 236 (2d Cir. 2002), multiple times to support its position that multiple transactions can be aggregated into a single scheme. Opp. at 8, 12. However, *Moloney* did not concern whether an indictment was duplicitous because that issue was waived, leaving the court to rule on an entirely different issue: whether a "non-offense" was charged. *Id.* at 239. ("A guilty plea waives any challenges to a duplicitous indictment…However, Moloney's claim that the indictment charges a non-offense is not waived"). The *Moloney* court only notes the broad proposition cited by the government as part of its analysis of whether the federal money laundering statute applies to schemes or individual transactions, an issue that has no relevance here. *Id.* at 241 ("Congress could, of course, pass a criminal law that could not be applied to a unified scheme. The question is whether the money laundering statute should be interpreted as such a law."). Moreover, unlike *Moloney*, this matter involves multiple alleged transactions *and* multiple alleged schemes.

indictment charging defendant with a single scheme to defraud multiple, unrelated banks duplicitous); *United States v. Munoz-Franco*, 986 F. Supp. 70, 71 (D.P.R. 1997) (finding counts duplicitous where two defendants participated in both conspiracy schemes, but where the transactions and participants in the schemes were otherwise "unconnected").

The government's cited authorities are inapposite, as each involves dramatically more intricate and intertwined schemes than the insider trading schemes charged here. In *United States v. Wey*, for example, the court found a single continuous scheme based in part on the "commonalities in purpose *and* execution" used by the defendant to defraud multiple financial institutions. 2017 WL 237651, at *4 (S.D.N.Y. Jan. 18, 2017) (emphasis added). The common execution employed by the defendant in *Wey* involved, in part, arranging for "Nominees to acquire blocks of stock in over-the-counter-traded U.S.-based shell companies, orchestrating reverse mergers by which Chinese operating companies acquired these shell companies, and facilitating the surviving companies' listing on NASDAQ through similarly deceptive circumvention of shareholder-base requirements." *Id.* at *4. The defendant in *Wey* used this same complex pattern, akin to a *modus operandi*, to conduct each of his three frauds. If courts considered Dr. Sarshar's alleged mode of execution—sporadic phone calls and text messages with friends and family—to be sufficient to satisfy the commonalities of execution in *Wey*, there would be virtually no limit to the government's ability to charge separate insider trading schemes in a single duplicitous count.

The government's efforts to distinguish the cases cited by Dr. Sarshar in his opening brief fall flat. For example, the "different groups of people, different corporate entities, and unconnected transactions" that the government claims distinguish *Munoz-Franco,* 986 F. Supp. 70 (D.P.R. 1997), are no distinction at all. *Contra* Opp. at 14. In *Munoz-Franco*, the court

concluded that the fraud indictment was duplicitous where the charged transactions in the first schemes were "totally unconnected with the transactions" in the second scheme, in particular because there was "not one instance of an overt act where there has been a crossing of lines of a participant" across schemes, and because the "participants in the conspiracies are different." *Munoz-Franco*, 986 F. Supp. at 72. Notably, although two of the defendants took part in both schemes, that overlap did not save the indictment.

Similarly, the government emphasizes that the court did not ultimately dismiss the indictment in *United States v. Gabriel*, 920 F. Supp. 498 (S.D.N.Y. 1996), but ignores the reasons why. *Contra* Opp. at 14. There, the court found that "on any but a superficial reading" the indictment alleged multiple distinct and separate conspiracies and that "*if it were within the power of the Court* to do, this Court would dismiss" based on duplicity. *Id.* at 504 (emphasis added). The court did not do so because determining whether multiple *conspiracies* exist is a job that juries are "singularly well suited" to perform. *Id.* (internal quotations omitted). But here, there is no multiple-conspiracies defense for Dr. Sarshar to assert, and he must therefore look to this Court to address the duplicitous charges in the Indictment.

By charging these disparate schemes in a single duplicitous count, the government exposes Dr. Sarshar to severe prejudice. *See United States v. Margiotta*, 646 F.2d 729, 733 (2d Cir. 1981) (noting the bar on duplicitous indictments is meant to "avoid[] the uncertainty of whether a general verdict of guilty conceals a finding of guilty as to one crime and a finding of not guilty as to another, avoid[] the risk that the jurors may not have been unanimous as to any one of the crimes charged, assur[e] the defendant adequate notice, provid[e] the basis for appropriate sentencing, and protect[] against double jeopardy in a subsequent prosecution"). Any conviction of Dr. Sarshar would not identify whether the conviction is based on a single

trade or multiple trades, one or more traders, or one or more pieces of MNPI. *See United States v. Hinton*, 127 F. Supp. 2d 548, 556 (D.N.J. 2000) (finding indictment duplicitous where "[i]n the event of a conviction, it would not be possible to determine which aspects of this so called unified scheme had been proved"). Because Dr. Sarshar has discrete and unique factual and legal defenses to each alleged tip and the trading of each alleged Associate, it is critical that Dr. Sarshar be able to defend against each scheme separately. For example, the evidence will show

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

████████ These defenses, and many others, will be at risk of getting lost in the sea of allegations contained in Counts 1 and 2 of the Indictment. The jurors will have the impossible task of trying to piece together where and when Dr. Sarshar learned of MNPI that he allegedly passed on to a particular Associate and that the Associate relied on in completing a particular trade. Indeed, the duplicitous Indictment poses a substantial risk that Dr. Sarshar would face a non-unanimous jury verdict, wherein different jurors find Dr. Sarshar guilty based on different schemes and different events. *See Ramos v. Louisiana*, 140 S. Ct. 1390, 1395 (2020) (requiring unanimous jury verdicts in criminal cases).

The government tries to defend its charging decision by making the disingenuous claim that charging a single scheme "inure[s] to the defendant's benefit." Opp. at 15. As an initial matter, this argument does not pass the straight-face test as no one is under the illusion that the government is looking out for Dr. Sarshar's best interest. Moreover, the government's argument is wrong both in practice and as a matter of law. The statutory maximums for insider trading (*e.g.*, 20 or 25 years) rarely guide a court's sentencing decision, and given that the Sentencing Guidelines require a grouping analysis under U.S.S.G. § 3D1.2, there is no risk that multiple counts would enhance any insider trading sentence. Thus, an acquittal on any of the four alleged schemes could significantly alter Dr. Sarshar's sentencing range.[4] The fact of the matter is that a duplicitous indictment does not benefit Dr. Sarshar but instead severely prejudices him.

The government claims that despite the concerns raised by Dr. Sarshar, any potential prejudice caused by the Indictment can easily be cured by appropriate jury instructions. The government's tepid support for potential, unspecified, future jury instructions offers Dr. Sarshar cold comfort when left unpaired with any detail or specificity about what these supposedly curative jury instructions would say. If the government were serious about preventing prejudice to Dr. Sarshar, it would at a minimum agree to a special verdict form to ensure Dr. Sarshar is not subject to the litany of likely prejudices to which the current Indictment exposes him.

It follows that the Court should dismiss the Indictment as duplicitous for the reasons articulated in Dr. Sarshar's July 1, 2021 Motion, *see* Mot. at 18-22, and the reasons stated herein.

---

[4] The government's reliance on *United States v. Olmeda*, 461 F.3d 271 (2d Cir. 2006), is misplaced. The *Olmeda* court did not state that duplicitous indictments benefit the defendant across the board, as the government suggests. Instead, the court made the limited comment that in *certain circumstances* duplicity "may" benefit a defendant. *Id.* at 281. As discussed, this is not one of those limited circumstances. Furthermore, the court in *Olmeda* found that the indictment in that case *was* duplicitous (though not prejudicially so) and ultimately dismissed the indictment on double-jeopardy grounds.

At a minimum, the Court should ensure the prejudice faced by Dr. Sarshar is managed through the issuance of a special verdict form that requires the jury to consider each of the four schemes charged in the indictment, and any alleged downstream tipping, separately, and requires the jury to reach a unanimous verdict as to each separate scheme.

**B.     The Court Should Order the Government to Produce a Bill of Particulars.**

This Court should order the government to produce a bill of particulars identifying (1) the MNPI that Dr. Sarshar allegedly communicated to each of the four Associates identified in the Indictment; (2) when and how Dr. Sarshar allegedly became aware of the MNPI; (3) when and how Dr. Sarshar allegedly communicated the MNPI to any tippee; and (4) the trades allegedly based on MNPI the government plans to use to convict Dr. Sarshar. This information is necessary to "enabl[e] [Dr. Sarshar] to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (citing Fed. R. Crim. P. 7(f)). And ordering a bill of particulars in these circumstances would advance the Advisory Committee on Rules' intent to "encourage a more liberal attitude by the courts toward bills of particular[.]" Fed. R. Crim. P. 7 advisory committee's note to 1966 amendment.

Courts in this district have acknowledged that such information is critical to presenting a defense in insider trading cases. In the words of Judge Gardephe, "particularization may be necessary where a defendant has been charged with an insider trading conspiracy, because '[t]he merits of such a charge depend heavily on facts and context.'" *United States v. Martoma*, 2013 WL 2435082, at *3 (S.D.N.Y. June 5, 2013). In a litany of high-profile insider trading cases, courts have ordered the government to disclose details in a bill of particulars substantially similar to the information Dr. Sarshar seeks here. *See, e.g.*, *United States v. Rajaratnam*, 2010 WL 2788168, at *4–9 (S.D.N.Y. July 13, 2010) (ordering disclosure of, among other things, "the

11

substance of the information provided" and "the date(s) on which it was conveyed"); *United States v. Contorinis*, No. 09-cr-1083-RJS (S.D.N.Y.), Dkt. 49 at 1 (ordering disclosure of the MNPI allegedly disclosed by the defendant); *United States v. Nacchio*, 2006 WL 2475282, at *6 (D. Colo. Aug. 25, 2006) (ordering the government to identify all MNPI that it alleged defendant was aware of during the relevant time period).

The government attempts to distinguish these cases on the ground they were "far more complex" than this case. Opp. at 23–24; *see also* Opp. at 25 n.5. However, the orders in *Contorinis* and *Nacchio* make no mention of those cases' alleged complexity, and in fact, the government expressly disclaimed any suggestion of complexity in *Contorinis*, No. 09-cr-1083-RJS (S.D.N.Y.), Dkt. 46 at 11 ("[C]ontrary to Contorinis' claims, the charges against him do not relate to 'numerous stocks traded hundreds of times over the course of more than two years.' Rather, with respect to trades based on UBS Inside Information, Contorinis need focus only on two relatively short time periods—trading in Albertson's securities between September 2005 and January 2006, and trading in BMHC securities in April and May 2006."). While it is true that the court in *Rajaratnam* noted that "in complex conspiracy cases like this one, the potential for unfair surprise and the difficulty of preparing a defense are *amplified*," it acknowledged that these are problems that inhere in *all* insider trading cases. 2010 WL 2788168, at *2 (emphasis added) ("A defendant might argue that the information he sought to obtain was not material, or that it was already public at the time he tried to get it. But he can only do that if he knows what the information *is* and when it was conveyed."). And given the government's heavy reliance on wiretap calls that identified the specific MNPI allegedly traded on, as well as the date and time of the calls, the alleged complexity in *Rajaratnam* was mitigated by detailed disclosures that far surpassed what the government has provided here. *See id.* at *9 ("[T]he government is not

required to provide particulars for a stock where the inside information is based solely on wiretap intercepts" because "[t]he defendants now have all of these intercepts, along with descriptions of the relevant conversations"). Thus, the court in *Rajaratnam* acknowledged that complexity was not a necessary condition for a bill of particulars. *Id.* at \*2 ("At issue in this case are 31 stocks, many more than the single stock at issue in *Nacchio* or the four stocks at issue in *Contorinis*," in which courts similarly granted bills of particulars).

The government nonetheless argues that the Indictment contains "sufficient factual detail" and that any deficiencies are cured by the "extensive discovery in this case." Opp. at 20–22. But the issue is not the *volume* of allegations, but their *specificity*. The Indictment consists of little more than a list of corporate events, communications, and trades that have nothing connecting them but their temporal proximity. For example, the government alleges that Auspex "signed a confidentiality agreement" with a potential suitor on March 6, Indict. ¶ 42, that Dr. Sarshar made a two-minute call to Associate-1 later that day, *id.*, and that Associate-1 purchased Auspex stock three days later, *id.* ¶ 43. But the government does not allege that Dr. Sarshar was present when Auspex executed the confidentiality agreement, when and how he became aware of it (if he ever did), or what he communicated to Associate-3 during their exchange on March 6. Similarly, the government alleges that "the Auspex CEO and other senior representatives of Auspex participated in in-person meetings in Israel" with Teva in February 2015, *id.* ¶ 44, that Dr. Sarshar spoke with Associate-4 while those meetings were ongoing, *id.* ¶ 45, and that Associate-4 purchased Auspex stock the day after the meetings concluded, *id.* But again, the government does not allege whether Dr. Sarshar was present at the meetings with Teva in Israel (he was not), whether or how he became aware of the content of the discussions, and whether he communicated that information to Associate-4.

The government's assertion that Dr. Sarshar's defensive motions demonstrate that he has acquired sufficient information through discovery to prepare for trial is mistaken. *See* Opp. at 22. Dr. Sarshar's motions have made a best guess at the government's theories and evidence, but there is no telling whether those motions have correctly characterized the government's case. More importantly, there is nothing to stop the government from changing its theory of the case should the Court find for Dr. Sarshar on these motions. The very purpose of a bill of particulars is to force the government to disclose the nature of the charges with sufficient specificity that the defendant is not left to attack a moving target as trial progresses. Neither the Indictment nor the government's discovery production accomplishes this purpose.

Indeed, far from clarifying matters, as the government contends, discovery in this case only further *obfuscates* the nature of the charges against Dr. Sarshar. For example, the Indictment alleges that Dr. Sarshar "provided Associate-1 with confidential information regarding a possible tender offer for Auspex" on March 11, 2015, and later the same day, "Associate-1 recounted to the CW the confidential information . . . regarding the anticipated tender offer." Indict. ¶¶ 21–22. ████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████ So what is the government's theory of liability? That Dr. Sarshar provided incorrect or misleading MNPI to the alleged tippees? That he provided MNPI but some alleged tippees did not believe him? That the alleged tippees would have sold more shares but for the MNPI they purportedly received from Dr. Sarshar? Or something else? Or does the government seek to hold Dr. Sarshar liable not for *these* trades, but

for some other trades by other alleged tippees or remote tippees?  There is no way to tell—and thus no way for Dr. Sarshar to prepare a defense.

Dr. Sarshar does not seek the "the Government's order of proof" or to compel disclosure of "the manner in which [the government] will attempt to prove the charges . . . or a preview of the Government's evidence or legal theories." *Contra* Opp. at 25–26.  That is hyperbole.  The defense does not seek a witness list, list of exhibits, or an understanding of how the government intends to *prove* its charges.  Rather, the defense merely seeks to *understand* the charges.  The government's resistance is telling and highly prejudicial.

The government is similarly misguided in its assertion that additional disclosures would "allow[] Dr. Sarshar to tailor any testimony to the Government's case more than eight months before trial."  Opp. at 23.  Trial by ambush is not the answer to the speculative risk that a defendant may be better prepared to rebut allegations if he knows what they are.  Our very system of justice and Due Process requires such disclosure.  *See United States v. Hernandez*, 980 F.2d 868, 871 (2d Cir. 1992) ("The purpose of [Rule 7] is to give a defendant adequate notice of the charges . . . to enable him to prepare a defense."); *United States v. Bentley*, 2006 WL 2193453, at *6 (D. Ore. July 31, 2006) ("Courts have construed [Rule 7] to require, like the Due Process Clause, that the indictment give sufficient notice of the crime to prepare a defense and plead double jeopardy.").  That is why the inquiry focuses not on how a bill of particulars will affect the government's case, but how the lack of a bill of particulars will affect the defendant's.  In any event, the government's cynical suggestion that Dr. Sarshar will manipulate his testimony in response to a bill of particulars is unjustified.  Dr. Sarshar has no need to do so because he did nothing wrong.  Finally, the government concedes that it will have to produce additional information about its charges before trial, so the risk it purportedly fears is unavoidable.

The government's authorities provide no basis for denying this request.[5] *See* Opp. at 24–25. In *United States v. Blakstad*, the defendant relied only on the voluminous discovery produced by the government in urging that a bill of particulars was necessary. *See* No. 19-cr-486 (S.D.N.Y.), Dkt. 49 at 5 ("[T]he prosecution has turned over 1.7 million 'files' on hard drive, representing phone records, trading records, social media, and bank records. . . . When the pretrial discovery is so voluminous that the accused remains in the dark about the criminal acts with which he is accused, a bill of particulars should be granted."). The court rejected the defendant's arguments, acknowledging that "bills of particulars may be ordered when the prosecution inundates the defense team with numerous files to sift through," but concluding that "the details contained within the Government's production and the manner in which it is organized" undermined the need for a bill of particulars. 2020 WL 5992347, at *11 (S.D.N.Y. Oct. 9, 2020). As noted above, however, the principal basis for Dr. Sarshar's request is the vague and ambiguous nature of the government's allegations—an issue that *Blakstad* did not address.

Moreover, unlike in *Blakstad*, the discovery produced by the government in this case is a mess. The government produced more than 250 gigabytes of data—approximately 700,000 documents—in multiple different file formats (load files, native files, forensic image) that took over a week to extract and inventory. Inventorying the production was further complicated by

---

[5] The Government oddly accuses Dr. Sarshar of "citing inapposite civil cases for general pronouncements regarding the materiality of 'preliminary, contingent, and speculative' acquisition discussions." Opp. at 26 (citing Mot. at 23). But the same standard of materiality outlined in *Basic Inc. v. Levinson*, 485 U.S. 978 (1988), applies in both civil and criminal cases. *See United States v. Nacchio*, 608 F. Supp. 2d 1237, 1247 (D. Colo. 2009) (concluding that, although "[t]he Defendant raises interesting theoretical questions as to whether a different standard should be applied with regard to forward-looking projections in insider trading cases, especially criminal actions," "[t]he *Basic* definition of materiality remains the current legal standard" in criminal cases).

the lack of a comprehensive index explaining where key records could be found. In addition, many documents arrived in a corrupted format, necessitating multiple follow-ups with the government. Meanwhile, other files, including Dr. Sarshar's iCloud account, were comingled with the iCloud accounts of others, requiring further conversations with the government to understand which material belonged to whom.

In *United States v. Pinto-Thomaz*, the court denied a motion for a bill of particulars because of the extensive disclosures by the government in the Indictment, including having "clearly describe[d]" the alleged MNPI, what time and in what capacity the defendant acquired the MNPI, the defendant's subsequent contact with the tippee, and the tippee's trades thereafter. 352 F. Supp. 3d 287, 302 (S.D.N.Y. 2018); *see also United States v. Pinto-Thomaz*, No. 18-cr-579-JSR (S.D.N.Y.), Dkt. 64 at ¶¶ 10, 21–23 [Superseding Indictment] (alleging that the defendant received "the price that Sherwin-Williams would offer per Valspar share . . . and the fact that the transaction had been approved by Sherwin-Williams' and Valspar's Boards of Directors," that he sent a text to the tippee that same day saying "give me a shout when you have some time," that the tippee subsequently opened a brokerage account and texted the defendant "'Account is open' and 'Let's meet tomorrow's [sic],'" and that the tippee thereafter purchased Valspar stock). This is precisely the information that Dr. Sarshar seeks from the government now, but which the government refuses to provide.

Similarly, in *United States v. Walters*, the court denied a motion for a bill of particulars in part due to "the detailed indictment, the discovery that's been produced, the searchability of the discovery, [and] the index," but it *granted* the motion and required the government "to identify all trades that [it] contend[s] are unlawful." No. 16-cr-338-PKC (S.D.N.Y.), Dkt. 51 at 27. Here, by contrast, the government has not provided a "detailed indictment," at least insofar as the

actual basis for the government's allegations are concerned. *See supra* at I.B., 13; *compare Walters*, No. 16-cr-338-PKC (S.D.N.Y.), Dkt. 8 at ¶ 23 [Indictment] (alleging that the tippee arranged "to provide [the tipper] with a loan of $625,000 with interest" in exchange for information "that Dean Foods had engaged an investment bank to explore strategic possibilities to separate Whitewave from Dean Foods," and that on the next business day the tippee "purchased one million shares of Dean Foods stock, which constituted approximately 21 percent of the daily trading volume in the stock"). And the government has not identified which of the alleged tippees' and remote tippees' trades it contends are unlawful—information that the court ordered the government to identify in *Walters*.[6]

In short, the government takes the view that the Court should engage in a rigid, mechanical analysis—simply counting the paragraphs in or pages of the Indictment and the quantity of discovery produced—when evaluating a motion for a bill of particulars. But the inquiry is not so simplistic. Where the government produces a Rorschach test of an indictment that leaves the defendant guessing as to the bases for the charges against him, together with reams of discovery that obscures rather than clarifies the government's theory of liability, the defendant cannot reasonably be expected to mount a meaningful defense. That is precisely what has happened here. As a result, the Court should grant Dr. Sarshar's motion and order the government to produce a bill of particulars.

---

[6] In *United States v. Stewart*, the court found that a bill of particulars was not necessary because, among other reasons, "[t]he Indictment and the Complaint contain sufficient detail regarding the nature of [the defendant's] breach of fiduciary duty, the character of the personal benefit he sought to receive for his participation in the alleged scheme and the 'meaningfully close personal relationship' that existed between him and his tippee, his father Robert." No. 15-cr-287-JSR (S.D.N.Y.), Dkt. 64 at 22 n.6. Here, the government does not allege what information Dr. Sarshar disclosed in violation of his duty to Auspex, the benefit he sought to gain from it (if any), and why he would have shared purported MNPI with some investors but not others.

**C.**     **The Court Should Grant the Motion to Strike.**

The government argues that the Indictment's allegations regarding Dr. Sarshar's alleged "lies" to FINRA and purported sharing of MNPI, as well as its use of "broadening language" (such as "among other things" and "including"), should not be stricken because they simply "provide background" and "describe the circumstances, means, and methods" of the charged offenses. Opp. at 28. In the alternative, the government argues that these allegations constitute admissible "other acts" evidence under Federal Rule of Evidence 404(b). *Id.* at 28-29. Finally, the government claims that any prejudice presented by the surplusage in the Indictment can be managed through a jury instruction. The government is wrong on all counts.

*First*, while the government insists that Dr. Sarshar's alleged "lies" to FINRA show that he "attempted to conceal his crimes," which supposedly "is admissible as direct evidence of his crimes," Opp. at 30, the Second Circuit has squarely held that alleged "'false exculpatory statement[s]' . . . [are] *not* useable as direct evidence of [a defendant's] guilt," *United States v. Perrone*, 936 F.2d 1403, 1409 (2d Cir. 1991) (emphasis added); *United States v. Di Stefano*, 555 F.2d 1094, 1104 (2d Cir. 1977) ("False exculpatory statements are not admissible as evidence of guilt . . . ."). Nor can the FINRA allegations be admitted to prove Dr. Sarshar's "motive, intent, and knowledge" or "consciousness of guilt." Opp. at 30. Dr. Sarshar's purported "lies" amount to nothing more than his statement to Teva's company counsel, sent without the advice of a personal lawyer only 90 minutes after receiving FINRA's inquiry, that he "could not recall" communicating with two individuals more than six months earlier. Indict. ¶ 10; *see also id.* ¶¶ 24, 42, 54b, 55b, 56b, 57. The government cannot dispute that "not being able to recall what happened is not the same as lying about the events." *United States v. Edwards*, 473 F. App'x 429, 435 (6th Cir. 2012); *United States v. Nealy*, 2016 WL 3660266, at *2 (A. Ct. Crim. App.

June 30, 2016), *aff'd*, (C.A.A.F. May 4, 2017) ("The fact that one does not remember something does not transform the lack of recollection to a false official statement"). Dr. Sarshar's statements to FINRA are not "lies" at all and are therefore irrelevant to his guilt or guilty conscience. They should therefore be stricken.

*Second*, the implied allegations, generalizations, and speculation in the Indictment do not "constitute relevant background to the charged conduct" or "describe relevant circumstances, means, and methods of [Dr. Sarshar's] offenses." Opp. at 31. In fact, the government wholly fails to address the glaring holes in these allegations:

- Indict. ¶¶ 42-43: The government asserts that Dr. Sarshar "called Associate-3 on the same day that Auspex signed a confidentiality agreement with a potential suitor different from Teva," after which "Associate-3 began purchasing substantial quantities of Auspex stock." Opp. at 31. But there are no allegations that Dr. Sarshar was aware of the confidentiality agreement, or that he discussed it with Associate-3. And the government does not dispute that the existence of a confidentiality agreement does not constitute MNPI as a matter of law. *See, e.g.*, *In re Columbia Pipeline, Inc.*, 405 F. Supp. 3d 494, 520 (S.D.N.Y. 2019).

- Indict. ¶ 26: The government alleges that Dr. Sarshar called Associate-1 on March 17, 2015, and "a close family member of Associate-1's" traded in Auspex later that day. But there are no allegations Associate-1 and the family member even communicated on March 17, or that Associate-1 shared MNPI allegedly received from Dr. Sarshar, and the government's opposition does not claim otherwise.

- Indict. ¶¶ 30-32: The government alleges that on February 24, 2015, Dr. Sarshar exchanged text messages with Associate-2 on "the same day Teva submitted to

Auspex its non-binding proposal to acquire Auspex." Associate-2 then allegedly "called the administrator of her Section 401(k) plan" to move funds into a self-directed brokerage fund to "purchase Auspex" shares. ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

- Indict ¶¶ 44-45: The government alleges Associate-4 purchased Auspex shares three days after speaking with Dr. Sarshar and following meetings between Auspex and Teva executives in Israel. But there are no allegations that Dr. Sarshar even knew about the Israel meetings, let alone that he disclosed them to Associate-4, and the government's opposition offers no new allegations to the contrary.

The government baldly asserts that the above paragraphs are admissible as "relevant background" to demonstrate "how and when the defendant provided Associate-1, Associate-2 and Associate-4 with MNPI, and what they did after receiving MNPI." Opp. at 31. But as outlined above, these speculative allegations are entirely devoid of *relevant* critical facts showing that Dr. Sarshar actually provided any of the Associates with MNPI—and the government's opposition does nothing to fill in the gaps. The allegations are therefore "not relevant to the crime[s] charged" and are merely "inflammatory and prejudicial." *United States v. Mulder*, 273 F.3d 91, 99-100 (2d Cir. 2001).

If anything, the government appears to rely on implied allegations that Dr. Sarshar engaged in a "pattern or practice" of sharing MNPI with Associates. But where a party offers evidence "to demonstrate a pattern of relevant conduct, the evidence must 'share unusual

characteristics with the act charged or represent a unique scheme,'" meaning that the two acts are "so unusual and distinctive to be like a signature." *Stephen v. Hanley*, 2009 WL 1471180, at *12 (E.D.N.Y. May 21, 2009) (quoting *Berkovich v. Hicks*, 922 F.2d 1018, 1022 (2d Cir. 1990)). The government cannot meet that high burden here, as it fails even to allege facts that connect the dots showing that Dr. Sarshar allegedly shared MNPI. *United States v. Garcia*, 291 F.3d 127, 138-39 (2d Cir. 2002) ("[g]iven the lack of any connection between the two offenses . . . we find that the court abused its discretion" in admitting "other acts" evidence).

*Third*, the government argues that certain "broadening language" (e.g., "among other things" and "including") is properly included in the Indictment because it "appropriately summarize[s] and set[s] forth the relevant circumstances, means, and methods by which [Dr. Sarshar] carried out his crimes." Opp. at 32. But the paragraphs at issue do not simply "summarize" the "information that follows" in the Indictment. *Id.* at 31-32. Paragraph 10, for example, states that Dr. Sarshar "lied" to FINRA, because "*[a]mong other things,*" he "falsely stated that he could not recall having any contact" with two associates. Here, "among other things" supposedly refers to *other* ways in which Dr. Sarshar allegedly lied to FINRA, but the Indictment does not contain any examples other than that listed in paragraph 10. The same is true with respect to the word "included" or "including" in paragraphs 21 and 22—the Indictment provides no other illustrative examples other than those listed. In paragraph 24, it is unclear whether "[a]mong other things" refers to the contacts between Dr. Sarshar and Associate-1 listed in that paragraph, or if it is meant to imply that there were *other* contacts not described in the Indictment. It is precisely because phrases like "among other things" introduce ambiguity about the conduct charged that they are routinely stricken. *See, e.g.*, *United States v. Kassir*, 2009 WL 995139, at *3 (S.D.N.Y. Apr. 9, 2009); *United States v. Mango*, 1997 WL 222367, at *16

(N.D.N.Y. May 1, 1997); *United States v. DeFabritus*, 605 F. Supp. 1538, 1547 (S.D.N.Y. 1985); *United States v. DePalma*, 461 F. Supp. 778, 798 (S.D.N.Y. 1978); *United States v. Pope*, 189 F. Supp. 12, 25- 26 (S.D.N.Y. 1960).

The government argues that the "broadening language" is permissible because it supposedly appears only in the "means paragraphs" of the Indictment rather than the charging paragraphs. Opp. at 32. The government argues that even though paragraphs 10, 21, 22, and 24 are "incorporated by reference in the charging paragraphs," they should nonetheless be treated as "means paragraphs" because "they concentrate on the means by which the defendant carried out the charged offenses." Opp. at 33 n.8. But the challenged paragraphs are not merely "incorporated by reference in the charging paragraphs"; they *are* the charging paragraphs. Courts in this district have made clear that "charging paragraph[s] . . . present[] the matter upon which the grand jury based its accusations against a defendant." *United States v. Washington*, 947 F. Supp. 87, 90 (S.D.N.Y. 1996); *DePalma*, 461 F. Supp. at 798-99 ("A charging paragraph in the Indictment sets forth the gravamen of the offense as charged by the grand jury"). Here, the challenged paragraphs follow the statement on page 1 of the Indictment, "The Grand Jury charges: . . . ." There can be no doubt that the paragraphs in the Indictment that follow— including the four paragraphs containing "broadening language"—"present[] the matter upon which the grand jury based its accusations" in this case. *Washington*, 947 F. Supp. at 90; *c.f. DePalma*, 461 F. Supp. at 790 (generally holding that means paragraphs go "to the matter of proof to sustain the charges" and specifically finding "the paragraph that introduces the RICO charge" to be the means paragraph of the indictment).[7]

---

[7] Contrary to the government's assertion, Opp. at 33 n.8, *United v. Mango*, 1997 WL 222367 (N.D.N.Y. May 1, 1997) is entirely consistent with the cases on which the government relies. All of these cases recognize that "[a] charging paragraph . . . sets forth the gravamen of the

*Finally*, the government argues that any unfair prejudice presented by surplusage in the Indictment can be cured by "instruct[ing] . . . the jury that the Indictment merely contains charges or accusations, and is not evidence." Opp. at 34. But if the surplus allegations in the Indictment are not relevant to the government's case, there is no reason why the Court should issue a limiting instruction rather than simply strike the prejudicial allegations from the Indictment. *Mulder*, 273 F.3d at 99-100 (motions to strike will be granted "where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial"). The government also argues there will be no unfair prejudice to Dr. Sarshar if the jury is not given a copy of the Indictment, a possibility it raises. *See* Opp. at 27 n.6. But even if the Indictment is withheld from the jury, which it should be, Dr. Sarshar will still be prejudiced if the improperly included surplusage is not stricken. For example, if the Indictment is left as is Dr. Sarshar will still be left without adequate notice of the extent of the acts he is being accused of, and he will still be forced to defend against the entirely irrelevant FINRA-related allegations. The Court should strike paragraphs 10, 24, 26, 30-32, 42-45, and 51-57 to "protect [Dr. Sarshar] against immaterial or irrelevant allegations . . . which may" be prejudicial. Fed. R. Crim. P. 7(d), Advisory Committee's note on 1944 enactment.

## II. CONCLUSION

For the foregoing reasons, we respectfully request that the Court: (i) dismiss the Indictment as duplicitous; (ii) order the government to provide a bill of particulars; and (iii) strike the prejudicial surplusage in the Indictment.

---

offense as charged by the grand jury,'" *id.* at *15 (quoting *DePalma*, 461 F. Supp. at 798), and none suggest that a paragraph that follows the phrase, "The Grand Jury charges: . . ." should not be treated as a charging paragraph.

Dated:  New York, New York         By:     */s/ Avi Weitzman*
        September 10, 2021

GIBSON, DUNN & CRUTCHER LLP
AVI WEITZMAN
REED BRODSKY
200 Park Avenue
New York, NY 10166
Telephone: 212.351.4000
Facsimile: 212.351.4035

*Counsel for Defendant Sepehr Sarshar*